# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MARTHA SPINKS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.** |
| | § | |
| | § | **5:15-cv-00749-RP** |
| | § | |
| **ALAMO AREA COUNCIL OF** | § | |
| **GOVERNMENTS,** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND/OR TO STRIKE, RESTRICT, EXLUDE OR DISALLOW EVIDENCE ADDRESSED BY THE 30(b)(6) DEPOSITION TESTIMONY

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Martha Spinks ("Spinks"), Plaintiff in the above entitled and numbered action against Defendant Alamo Area Council of Governments ("AACOG"), who alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §2000e, *et seq.*, the Equal Pay Act, as amended, ("EPA"), 29 U.S.C. §206(d), and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code § 21.001, *et seq.,* and files this Motion for Summary Judgment and/or to Strike, Exclude, Disallow or Restrict Testimony Addressed by the Defendant's 30(b) (6) Testimony on behalf of Defendant Alamo Area Council of Governments, hereinafter "AACOG," and for cause shows unto the Court the following:

## I. Parties

1.      Spinks, a female, is a former employee of Defendant AACOG, who was wrongfully

terminated after complaining and requesting information regarding sex discrimination and potential

violations of the Equal Pay Act and related Texas statutes and for otherwise opposing discrimination

against other employees and indicating her opposition to discrimination.

2.      Defendant **ALAMO AREA COUNCIL OF GOVERNMENTS** is a governmental entity

doing business in Bexar County, Texas.

## II. FACTUAL BACKGROUND

3.              Spinks began her employment with AACOG in June 2009.  She **ca**me to AACOG

with over 30 years of experience managing and directing complex social services organizations.  For

example, she previously worked in the following positions:

> -1976-2000, developed and administered Soldier and Family Support Programs for U.S. Army and Department of Defense worldwide

> - 2000 Retired as Lieutenant Colonel, Master of Social Work and Ph.D., Social Welfare Policy

> - 2000-2008 Executive Director of St. Barnabas Senior Services, an innovative, award winning senior social services agency in Los Angeles, CA, that like, BAAA, is primarily funded through the Older Americans Act

> - During time in Los Angeles, she also was adjunct professor at University of Southern California school of gerontology, teaching systems administration and management

> - Also published articles in trade journals and made professional presentations

> - When she resigned from St. Barnabas Senior Services, my annual salary was approximately $120,000, plus benefits

4.      When she applied for the position of Director, Bexar Area Agency on Aging in May 2009,

she was interviewed by Susan Lodge, Cindy Krueger and Debbie Billa and offered the job the next

day by Cindy Krueger, the Director of Administrative Services for AACOG.

5.      She asked if the $60,000 salary might be negotiated.  Ms. Krueger said that AACOG policy stated that salaries were not negotiated and that all program directors started at the same salary.  She accepted the position and started working at AACOG on June 1, 2009.

6.      In December 2013, she saw an internal announcement for the position of Assistant Program Director of Alamo Regional Transit (ART).  Based on the salary that was advertised for this position, she surmised that the Director of ART, who had joined AACOG a few months earlier in 2013, and who was her peer as a program director, was earning more than she was.

7.      She asked her supervisor, Susan Lodge, who also was the supervisor of the director of ART, if he was earning more than Spinks and she stated "yes," but did not give further details.  Spinks had the impression that he might have been hired at a higher grade than the one published for program directors.  Later, in July 2014, Ms. Lodge told Spinks that around December 2013, she had recommended the ART director for an additional raise over his starting salary.  Ms. Lodge stated that she did this in hopes of using this as a precedent to raise the salaries of other program directors; specifically Gloria Vasquez, the Alamo Area Agency on Aging Director, and Spinks.  They had been hired a year apart.

8.      Spinks then spoke to Sherrie Huckabay, the Human Resources Director for AACOG and asked her the same question.  She gathered from her expression that her beliefs about unequal pay were true.

9.      Spinks asked Ms. Huckabay if Spinks might make a public information request for salary data at AACOG.  She said yes, and added that she should request information about the pay of all employees in writing.

10.    In December 2013, Spinks submitted a request in writing for this information:  name, title, grade, original date of hire, date of any changes in title or grade, and salary for all employees for each of the years she had been employed at AACOG, 2009-2014.  After Spinks received the data, Spinks submitted a second request with a spreadsheet illustrating what she wanted, because the first response did not contain all that she requested.  On the second request, she asked for the same data only for program directors, managers and senior directors, as they hold related positions.

11.    Spinks received most of the information she requested in January 2014 and began putting the information into spreadsheets and graphs to analyze the data.

SALARY COMPARISONS

Figure 1 below demonstrates a consistent difference between the starting salary for Spinks and that of male program directors, who she considered her peers.

### Figure 1:  Comparison of AACOG Program Directors Hired 2009-2014

| Employee Name/ Gender (M/F) | Date of Hire | Position Title | Starting Salary | Previous Experience, Education |
|---|---|---|---|---|
| Spinks (F) | 6/1/2009 | Program Director, Aging | $60,570 | 32 years experience directing social services programs; 24 years as Army officer, 8 years executive director of a nonprofit for seniors funded by Older Americans Act, as BAAA is; Master's degree, social work; Master's degree, psychology; Ph.D. social welfare policy |
| Herr (M) | 8/3/2009 | Program Director, Transit | $73,008 | Retired as artillery officer, U.S. Army in recent past; some experience with TXDot, but may have limited experience specific to operating a rural transit system; education unknown |
| Quinn (M) | 3/3/2010 | Program Director, Public Safety | $64,230 | Previous experience with law enforcement, consulting with Brooks AFB on facilities management and City of San Antonio on technology; Master's degree.  My salary at this time: $61,172 |

| Moseley (M) | 4/22/2013 | Program Director, Transit | $66,830, with reported additional raise in December 2014 | A few months before retirement as logistics officer, U.S. Army, began employment as ART Director; while previous position put him in charge of supply and services for a large military organization, this would not include a great deal of specific experience in rural transit operations.  My salary at this time:  $66,747 |
|---|---|---|---|---|

12.   It is apparent that Senior Directors—Sherry Huckabay, Tim Trevino, and Joe Ramos primarily—in the last three years enjoyed rapid salary increases (in the range of 50%-73%) and promotions while other staff remained stagnant.

13.   AACOG policy states that no one may be promoted:  If a position is upgraded, the incumbent is required to apply for the job along with other internal candidates.  It appears that the new positions assumed by these individuals were not always advertised internally in accordance with AACOG policy, to open competition by all staff.

14.   When Mr. Danos became Executive Director, he selected Mike Quinn as Deputy Executive Director without posting the position to recruit others internally who might be interested in the position.

15.   In 2013, the Chief Financial Officer sent an email announcement to staff congratulating the Controller on being named a Senior Director, to put her on par with the other members of the Senior Staff.  This position was not advertised internally.

16.   Comparison of the responsibilities of these senior director positions to program directors also raises questions.  Program directors supervise the vast majority of the staff, create budgets, manage the budgets and programs, and are responsible for community outreach and development of their

programs.  Their activities generate 80-90% of all AACOG income, but their salaries are not commensurate with their responsibilities compared to the cadre of Senior Directors that has proliferated in the last three years.

17.     Likewise, lower positions, such as HR specialists, were rapidly posted and filled with associates of the HR director within AACOG; other staff were interested in applying, but were unable to respond due to the rapid posting.  In addition, program directors' requests to fill positions languish for weeks or months and rarely receive the rapid turnaround of senior programs directors.

18.     At best, the pattern of salaries at AACOG appears random and needs to be thoroughly evaluated—possibly by an outside expert—and realigned.  At worst, the pattern of randomness in posting positions and setting salaries suggests cronyism, and a means of creating a tight knit group of Senior Directors whose energy may be directed toward self enhancement at the expense of other staff and the agency as a whole.

**PERFORMNACE HIGHLIGHTS**

19.     During her tenure, the size and scope of BAAA have expanded. Until her most recent evaluation after her complaints and investigation of discrimination and equal pay violations, Spinks' performance was rated Exceptional or Highly Effective.  Moreover she had been recognized by Department of Aging and Disability Services for innovative and effective programing.  The programs in which she was involved have received numerous awards at state and national level. Spinks had written millions of dollars in successful competitive grants applications—a departure for AACOG which has traditionally depended on formula grants which largely come from state or federal sources by completing paperwork, with little risk of not receiving the grant.  She

significantly expanded community engagement and collaboration through three programs in particular (1) Mobility Management, which has generated close to $2M in grants for a program that otherwise is unfunded; (2) Veterans, which has led to partnerships with San Antonio Area Foundation, Chamber of Commerce, Joint Base San Antonio and others in the creation of a major community collaborative that is viewed as a model. In addition, I have added services for veterans and their family members and integrated veteran services into the operation of BAAA; (3) She assisted Susan Lodge to write grant proposals to Texas Veterans Commission requesting funding for home modifications and financial support for disabled veterans, resulting in three grants totaling $725,000 from 2011-2013, and in June 2014, the home modifications program received a new grant of $500,000 to continue the work. This model has led DADS to prepare an LAR to the state legislature for the 2015 session to replicate the BAAA model and the Affordable Care Act Health Insurance Exchange, which significantly out-performed every other metropolitan area in the state of Texas

## RETALIATION

20.     On February 26, 2014, the AACOG board of directors put the Executive Director, Dean Danos, and his Deputy Executive Director, Mike Quinn, on administrative leave after one of more senior directors reported on questionable activities that involved agency funding, and perhaps other issues. A month later, the two were terminated.

21.     On announcing their administrative leave, the board named the CFO the interim executive director. A week later, the board decided to name the CFO and two senior directors as interim co-executive directors. 4-6 weeks after that, the board name Kevin Wolff, the chair of the board, the

interim executive director, but staff were told that the three interim co-executive directors would remain in charge of daily operations, with Commissioner Wolff intervening when they had difficulty making a mutual decision or one that would be risky for them to make.

22.     Shortly after the announcement that he would be an interim executive director, Commissioner Wolff called all the supervisors of AACOG together to explain the arrangement.  He led off his comments by saying that he was aware that a rift existed between program directors and managers and senior directors.  He stated that he had complete confidence in the interim co-executive directors, and implied that any problems related to the rift were the fault of program directors. He declared that the rift would come to an end and he strongly encouraged any supervisor (not senior directors) who was unhappy with the circumstances to resign from AACOG.

23.     Several program directors and managers responded in a respectful way that they would like very much for him to have a meeting with program managers and directors and listen to their suggestions about how AACOG could get past its current problems and be more productive than before.  Spinks was one of the people who made such comments.

24.     Commissioner Wolff sidestepped and dismissed these comments, to the frustration of many in the audience.  When Spinks attempted to reiterate the points other supervisors had made, hoping to clarify and encourage dialogue with Commissioner Wolff, he responded with some irritation and sarcasm and said to Spinks, in front of the group, that psychologists would say she was resistant because she was sitting with her arms crossed. At that time, Commissioner Wolff flatly stated that he had no intention of asking for input from program directors.

25.      On March 4, 2014, the HR director notified Spinks that the Lead Navigator for ACA Health Insurance enrollment, a temporary employee, would be fired because she inadvertently sent a staff person's social security number to the funding agency without using security protection on the email.  Spinks asked if a permanent employee would be fired for such an infraction and she said no. She stated that AACOG policy specified that temporary employees would be fired, however.  Spinks reported this to Susan Lodge, her supervisor, who requested to meet with the CFO, who at that time was the acting ED.  The ED and HR director scheduled the meeting for the next morning, not telling Spinks that they had instructed the temp agency to fire the Lead Navigator.  They said that Commissioner Wolff directed them to take this action.   The action largely undermined the enrollment program, which was to conclude March 31**.**

26.      Susan Lodge had been Spinks' supervisor for a little more than half of Spinks' time at AACOG. On March 9, 2014, she left the office under mysterious circumstances that interim co-executive directors at AACOG would not explain.  Her subordinates did not know if she had become ill or if something else had happened, and they did not know if/when she would return.

27.      On April 9, 2014, Spinks received a performance evaluation from Tim Trevino, who had been designated her supervisor the week before.  The performance evaluation was extremely negative, largely based on hearsay, reading as if it were written by a committee consisting of the HR Director and the Controller, and referring to at least two incidents that had occurred in the previous rating period.  When Spinks pointed out to him that she shouldn't be rated on events from the previous rating period, Tim said he didn't care.  Previous supervisors rated her performance Exceptional three times and Highly Effective once:  this one rated Spinks as Effective—the midpoint to the rating scheme, where the supervisor does not have to write a narrative at all; however, Tim

went to extraordinary lengths to criticize practically every aspect of Spinks' work, suggesting that this was the beginning of a paper trail.

28.    Spinks was unable to complete a rebuttal until May 19, because she was out of the country for two weeks and the wide-ranging critique that she received required a good bit of time to respond to. Spinks emailed it to Tim on May 19, along with a request to meet to discuss her performance goals for the coming year.  She got an automatic receipt, but he never responded to the email.  After her complaints, she continued to suffer retaliation and counselings until her termination.

29.    Spinks filed a charge of discrimination based on sex and the Equal Pay Act claims with the EEOC and TCHR on or about July 11, 2014, alleging that she was not paid equal pay for equal work, that she suffered sex discrimination and suffered retaliation after her complaints.  After filing her initial charge and complaining internally with AACOG, she was subsequently terminated on January 12, 2015 and filed an amendment to the charge based on her termination on January 16, 2015.  In connection with that charge, Spinks received a Notice of Right to Sue from the EEOC on or about June 8, 2015.  This suit was filed within ninety (90) days of receipt

30.    As a result of AACOG's actions as described Spinks asserted that the acts of AACOG constituted unlawful discrimination on the basis of Spinks' sex in violation of 42 U.S.C. §2000e-2(a) and TEX. LAB. CODE § 21.051, Spinks further asserted AACOG paid Spinks unequal compensation based upon her sex in comparison to her male counterparts in violation of 29 U.S.C. §206(d)(1) and 29 U.S.C. §215(a)(2), and asserted that as a result of her complaints she suffered retaliation and was wrongfully terminated.

### III.
### ISSUES PRESENTED AND ARGUMENT

When a party is served with a Rule 30(b)(6) deposition notice it has just two choices – either appear with one or more witnesses designated to testify about the listed topics or file a motion for protection. In this case, Plaintiff served a Rule 30(b)(6)

deposition notice asking for a corporate witness to testify about certain issues (see Exhibit A).  Defendant represented that certain witnesses would appear and testify as to certain topics and filed no objections to the deposition notice.  Defendant produced one sole person as their corporate representative, Executive Director Diane Rath.  However, when questioned, the witness failed to provide testimony or the factual bases for the areas at issue in this case.  Defendant filed no motion for protection and then failed to provide a witness as required.  Given its failure to provide this discovery, and the concomitant lack of disclosed evidence, should the Court grant summary judgment or disallow any controverting evidence regarding the issues/areas?

## SUMMARY OF ARGUMENT

### A.    AACOG'S Position, Voiced Through Its Failure to Appear for Its Rule 30(b)(6) Deposition, Is That It Has No Evidence Supporting Its Defenses and/or Areas It Failed to Address.

31.    A Rule 30(b)(6) deposition is one way to obtain discovery from a corporation or other organizational entity. The rule is intended to streamline the discovery process, allowing the deposing party to seek binding corporate testimony on specified topics without having to "play a frustrating game of blind man's bluff in naming the appropriate corporate officer to be deposed or from being bandied from pillar to post by deposition witnesses who disclaim personal knowledge on topics with which others in the corporation are familiar . . .." *Johnson v. Big Lots Stores, Inc.*, 2008 WL 6928161, *2 (E.D. La. May 2, 2008). At the same time, it affords the corporation being deposed "more control by allowing it to designate and prepare a witness to testify on [its] behalf." *U.S. v. Taylor*, 166 F.R.D. 356, 360 (M.D.N.C. 1996). For all parties to enjoy the rule's benefits, and for the process to run smoothly, each party must do some extra work. *Resolution Trust Corp. v. Southern Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir. 1993). Specifically, the deposing party must lay out in advance the issues to be discussed, a duty that is not required for other depositions. In turn, the party being deposed must carefully select at least one representative for each issue.

32.     As noted, Spinks served a Rule 30(b)(6) deposition notice on AACOG (Exhibit A). The deposition was scheduled within the discovery period but was ultimately rescheduled to November 1, 2016.  Each time, Plaintiff's counsel was informed that Diane Rath would appear as the corporate representative as to all areas listed.  At no time was there any indication that other individuals would be produced as corporate representatives.  Indeed, to date no other person has been produced as a corporate representative and the discovery deadline has passed.   The deposition of the corporate representative Diane Rath is attached as Exhibit B. AACOG's options upon receiving the notice were not complicated:

> A party served with a Rule 30(b)(6) deposition notice must respond in one of two says. *See* Fed. R. Civ. P. 37(d). First, a party can designate a person to testify at a deposition.  *Id.*; *see also Bregman v. District of Columbia*, 182 F.R.D. 352, 355 &n.3 (D.D.C. 1998). . . . Second, a party may move for a protective order "for good cause shown." FED. R. CIV. P. 26(c); *see also* FED. R. CIV. P. 37(d). If a party doesn't designate a person to testify at a deposition or move for a protective order, that party has violated Rule 37(d). FED. R. CIV. P. 37(d); *Bregman*, 182 F.R.D. at 355.

*Ferko v. NASCAR,* 218 F.R.D. 125, 133 (E.D. Tex. 2003). The Federal Rules expressly establish that a party's failure to timely designate and present a Rule 30(b)(6) witness "may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has a pending motion for a protective order as provided by Rule 26(c)." *Id.* at 142, quoting FED. R. CIV. P. 37(d). AACOG filed no such motion before the scheduled deposition, or at any time after.

33.     When a corporation designates and produces an unknowledgeable witness it is, "for all practical purposes, no appearance at all."  *Resolution Trust Corp.*, 985 F.2d at 197.  It follows logically that when a party fails to appear for its Rule 30(b)(6) deposition, it must be foreclosed from later presenting evidence about the very topic it has refused to testify about:

> . . . [P]laintiff reads Rule 30(b)(6) as precluding defendant from adducing a theory

of the facts that differs from that articulated by the designated representatives. Plaintiff's theory is consistent with both the letter and spirit of Rule 30(b)(6). First, the Rule states plainly that persons designated as corporate representatives "shall testify as to matters known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). This makes clear that a designee is not simply testifying about matters within his or her own personal knowledge, but rather is "speaking for the corporation" about matters to which the corporation has reasonable access. *United States v. Taylor,* 166 F.R.D. 356, 361 (M.D.N.C.1996), *aff'd United States v. Taylor,* 166 F.R.D. 367 (M.D.N.C.1996) (quoting 8A Charles Alan Wright *et al.,* Federal Practice and Procedure, § 2103, at 36–37 (2d ed.1994)).

By commissioning the designee as the voice of the corporation, the Rule obligates a corporate party "to prepare its designee to be able to give binding answers" in its behalf. *Ierardi v. Lorillard, Inc.,* 1991 WL 158911, at *3 (E.D. Pa. Aug.13, 1991); *Taylor,* 166 F.R.D. at 361 (designee "presents the corporation's 'position' on the topic") (internal citation omitted). **<u>Unless it can prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition.</u>** *See Ierardi,* 1991 WL 158911, at *3; *Taylor,* 166 F.R.D. at 362.

*Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998) (emphasis added).

AACOG knows the factual basis, if any, for the assertions that it made in this lawsuit. After all, Defendant surely does not contend that it asserted these defenses without having a factual basis to plead them; anything less would have violated Rule 11. FED. R. CIV. P. 11(b). Ultimately, the Defendant here demands license to first plead defenses without stating any factual predicate and then, when Plaintiff attempts to uncover those facts through discovery, to stonewall by violating the rules and refusing to participate in discovery. Defendant made its summary judgment bed by not appearing for its deposition. In other words, presenting witnesses who had no knowledge of the areas for which the witnesses were produced; the Court should now make Defendant lie in it.

## IV.
## <u>SPINKS ASKED FOR THE DEPOSITION OF A CORPORATE RESPRESENTATIVE TO TESTIFY ON BEHALF OF AACOG</u>

34.   Pursuant to Rule 30(b)(6), Spinks asked for the deposition of a corporate representative to

testify on behalf of AACOG regarding a number of separate areas.  A list of the areas was initially provided by email and by notice and the deposition was ultimately taken on November 1, 2016, after a series of reschedules of the deposition.  The deposition is attached as Exhibit B and the notice is Exhibit A.  The deposition notice listed 26 separate relevant areas to be covered by the deposition.

Defendant AACOG has consistently only identified one individual to be produced as a corporate representative, Diane Rath.  As indicated, her deposition as corporate representative was taken on November 1, 2016.  Spinks will now discuss the relevant areas and testimony at issue.

To the extent any witness was produced to testify regarding certain areas and/or failed to testify regarding those areas for which they were produced, it is requested that their testimony and the testimony of any other witness appearing on behalf of AACOG be restricted or prohibited. The discovery deadline of October 23, 2016, has passed and the motions deadline of November 23, 2016 is now upon us.

**THE DEPOSITION AREAS AT ISSUE**

As indicated there were 26 different areas of testimony identified for the corporate representative.  Defendant AACOG failed to comply with providing a witness or testimony regarding the following areas and any testimony of Plaintiff Spinks regarding those areas should be taken as true for all purposes:

1.      Any investigation and determination related to the complaints of, termination and/or any prior discipline and/or evaluations of the Plaintiff;

Rath testified that she could testify as to the termination but could not testify as to the areas of complaints of Spinks, prior discipline and/or evaluations of Plaintiff or investigations related thereto (See Rath corporate rep deposition at p 5 L16-p 8 L 4).

2.      Any investigation and determination related to any complaints of harassment, discrimination, termination and/or retaliation by Plaintiff;

Rath testified that she could not testify as to the investigation and determination related to any complaints of harassment, discrimination, termination and/or retaliation by Plaintiff (See Rath corporate rep deposition at p 8L5-p 9 L 14).

3.      The employee handbook and guidelines;

4.      Any harassment, discrimination and retaliation policy related to Plaintiff's claim;

Rath testified that she could not testify as to any harassment, discrimination and retaliation policy related to Plaintiff's claim (See Rath corporate rep deposition at p 15 L24-p 16 L 9).

5.      Benefits and pay the employee received and/or would have received had she remained employed;

6.      Any prior complaints of re reports or inquiries regarding violations of the Equal Pay Act or sex discrimination, wrongful termination and/or harassment, including those involving the employees and/or supervisors involved in the present matter;

Rath testified that she could not testify regarding item 6 (See Rath corporate rep deposition at p 19 L19-p 20 L 2).

7.      Any investigation and/or background check conducted involving the employees and/or supervisors involved in the present matter, including investigations conducted regarding Plaintiff's complaints and/or requests regarding the Equal Pay Act and/or sex discrimination or retaliation;

Rath testified that she could not testify as to item 7 (See Rath corporate rep deposition at p 20 L3-p 21 L 2).

8.      The employee's personnel file and prior attendance and discipline and prior leave requests;

Rath testified that she could not testify as to area 8 (See Rath corporate rep deposition at p 21 L3- L 7).

9.      Any defenses asserted by Defendant;

Rath testified that she could not testify as to any harassment, discrimination and retaliation claims but only as to the termination related to Plaintiff's claim (See Rath corporate rep deposition at p 21 L8-p 23 L 25).

10.     The claims made the basis of the present suit, including any and all determination and reasons for the termination of Plaintiff and related facts;

        Rath testified that she could not testify as to any harassment, discrimination and retaliation related to Plaintiff's claim (See Rath corporate rep deposition at p 23 L25-p 25 L 17).

11.     Damages sought by the Plaintiff, including pay and benefits received by Plaintiff and/or to which she was entitled or would have been entitled;

12.     The identity and facts regarding any and all employees of Defendant who were demoted, disciplined, suspended, counseled, suspended, reprimanded, placed on leave, terminated, discharged and/or laid-off within the last ten (10) years under and/or for the same policy, procedure, rule and/or regulation that was utilized and implemented by the Defendant with regard to Plaintiff(s);

        Rath testified that she could not testify as to item 12 with regard to other employees (See Rath corporate rep deposition at p 25 L18-p 32 L 3).

13.     The identity and facts regarding any and all employees of Defendant who could have been but were not demoted, disciplined, suspended, counseled, suspended, reprimanded, placed on leave, terminated, discharged and/or laid-off within the last ten (10) years under and/or for the same policy, procedure, rule and/or regulation that was utilized and implemented by the Defendant with regard to Plaintiff(s), including those employees that were simply given a warning, suspended and/or given other disciplinary measures other than termination;

        Rath testified that she could not testify as to other employees with regard to item 13 (See Rath corporate rep deposition at p 32 L4-p 32 L 12).

14.     The persons, supervisors and managers who participated in any manner in the decision to layoff, discipline and/or terminate Plaintiff;

        Rath testified that she could not testify as to item 14 regarding any harassment, discrimination and retaliation (See Rath corporate rep deposition at p 32 L13-p 32 L 25).

15.     The job duties, wages, job requirements, job description, job duties, pay grade, and position responsibilities of a person in Plaintiff's position;

16.     The names, titles, genders, original dates of hire, dates of any changes in title or grade, and salary of program directors, managers, and senior/executive directors from 2010 to 2015, including Ben Herr, Mike Quinn, Bill Moseley, Tim Trevino, Joe Ramos, Susan Lodge and Sherry Huckabay;

17.    Employer handbook, policies, and procedures on hiring, pay increases and/or raises, promotions, position upgrades, and applications for the same;

18.    Employer handbook, policies, and procedures on pay grades, seniority, the "HR Project Management Survey," and merit awards;

Rath testified that she could not testify as to the survey related to Plaintiff's claim (See Rath corporate rep deposition at p 43 L6-p 43 L 19).

19.    Plaintiff's complaints, inquiries into, questions about, and/or reports of unequal pay between men and women employees of Defendant and program directors or assistant program directors, including information provided by Plaintiff regarding her complaints;

Rath testified that she could not testify as to item 19 related to Plaintiff's claim (See Rath corporate rep deposition at p 43 L20-p 44 L 4).

20.    Plaintiff's complaints, inquiries into, questions about, and/or reports of having job duties removed from her, including the Mobility Management Program removed from her control by Defendant;

Rath testified that she could not testify as to item 20 (See Rath corporate rep deposition at p 44 L5-p 44 L 21).

22.    Any contention  that Defendant considered Plaintiff's pay was equal to that of her male peers based on her seniority, experience, job duties, skill, training, and/or pay grade at date of hire;

Rath could not testify as to 22 related to Plaintiff's claim (See Rath corporate rep deposition at p 44 L22-p 45 L 17).

23.    Any contention that Plaintiff did not perform work that required equal skill, effort and responsibility under similar working conditions of her male counterparts;

24.    The job duties, wages, job requirements, job description, job duties, pay grade, and position responsibilities of Plaintiff;

25.    Any determination regarding compensating Plaintiff, who made decisions regarding Plaintiff's compensation, and the amounts paid to her;

Rath testified that she could not testify as to item 25 (See Rath corporate rep deposition at p 46 L7-p 46 L 12). Although referenced in her answer, Trevino has never been designated or produced as a corporate representative.

26.    Any and all program directors hired from 2009 through 2015 and any determinations regarding pay or position, including any posting for said positions.

Rath testified that she could not testify as to item 26 (See Rath corporate rep deposition at p 46 L13-p 47 L 2).

As is demonstrated, Defendant AACOG failed to provide even an image of its defenses from which they can present any affirmative defenses to the discrimination and/or retaliation claims or Equal Pay Act violations. Contrary to any representations by Defendant, they have never offered to produce another individual as a corporate representative nor identified other individuals as corporate representatives for any areas.  They have failed to comply with producing a corporate representative as to areas 1, 2, 4, 6, 7, 8, 9, 10, 12, 13, 14, 18, 19, 20, 22, 25, and 26, which areas are all central to Plaintiff's claims of discrimination, harassment, retaliation and Equal Pay Act claims.  Defendant should not be rewarded for its conduct.

## **PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Spinks respectfully prays that the testimony and evidence of Defendant and its witnesses be limited and/.or restricted or prohibited based on the testimony already provided in the depositions of its corporate representative presented as to the areas identified in the corporate representative notice and depositions.  Spinks further requests that judgment be entered for the Plaintiff Spink against Defendant for her claims of discrimination and/or retaliation and/or violations of the Equal Pay Act  and/or for damages in an amount within the jurisdictional limits of the Court, damages, attorneys' fees and expert fees, together with interest, including pre and post judgment interest, as allowed by law; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

/s/ Adam Poncio
**Adam Poncio**
**State Bar No. 16109800**
**Thomas N. Cammack, III**
**State Bar No. 24073762**

**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Road, Suite 109**
**San Antonio, Texas 78229-3550**
**Telephone:     (210) 212-7979**
**Facsimile:      (210) 212-5880**

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was forwarded to the

following counsel of record by the court's filing system on this the 23rd day of November, 2016:

Charles S. Frigerio.

      State Bar No. 07477500
      Hector X. Saenz
      State Bar No. 17514850
      LAW OFFICES OF CHARLES S. FRIGERIO,
      A Professional Corporation
      111 Soledad, Suite 840
      San Antonio, Texas 78205
      (210) 271-7877 Telephone
      (210) 271-0602 Facsimile

                    /s/ Adam Poncio____
                    **ADAM PONCIO**

# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MARTHA SPINKS** | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:15-CV-00749-RP** |
| | § | |
| | § | |
| **ALAMO AREA COUNCIL OF** | § | |
| **GOVERNMENTS** | § | |

**NOTICE OF INTENTION TO TAKE ORAL DEPOSITION OF A CORPORATE**
**REPRESENTATIVE OF ALAMO AREA COUNCIL OF GOVERNMENTS**

TO:    Defendant, Alamo Area Council of Governments
       By and through its attorneys of record

       Charles S. Frigerio
       Hector X. Saenz
       Law Offices of Charles S. Frigerio
       111 Soledad, Suite 840
       San Antonio, TX 78205

       PLEASE TAKE NOTICE that pursuant to Rules 30 and 32 of the Federal Rules of Civil

Procedure, Plaintiff will take the oral deposition of the person stated below:

| | |
|---|---|
| **DEPONENT:** | **A Corporate Representative of**<br>**Alamo Area Council of Governments** |
| **DATE:** | **November 1, 2016** |
| **TIME:** | **10:00 a.m.** |
| **LOCATION:** | **LAW OFFICES OF CHARLES S. FRIGERIO, P.C.**<br>**111 Soledad, Suite 840**<br>**San Antonio, TX 78205** |

The deposition will continue thereafter from day to day until completed, and will be taken

in the presence of a certified court reporter. Such testimony may be used at the time of trial of this

cause. This deposition may be videotaped.

The Plaintiff wishes to examine and requests that the Defendant produce the witness or witnesses so designated on the following matters for each of the respective defendant(s) and/or corporation(s):

1. Any investigation and determination related to the complaints of, termination and/or any prior discipline and/or evaluations of the Plaintiff;

2. Any investigation and determination related to any complaints of harassment, discrimination, termination and/or retaliation by Plaintiff;

3. The employee handbook and guidelines;

4. Any harassment, discrimination and retaliation policy related to Plaintiff's claim;

5. Benefits and pay the employee received and/or would have received had she remained employed;

6. Any prior complaints of re reports or inquiries regarding violations of the Equal Pay Act or sex discrimination, wrongful termination and/or harassment, including those involving the employees and/or supervisors involved in the present matter;

7. Any investigation and/or background check conducted involving the employees and/or supervisors involved in the present matter, including investigations conducted regarding Plaintiff's complaints and/or requests regarding the Equal Pay Act and/or sex discrimination or retaliation;

8. The employee's personnel file and prior attendance and discipline and prior leave requests;

9. Any defenses asserted by Defendant;

10. The claims made the basis of the present suit, including any and all determination and reasons for the termination of Plaintiff and related facts;

11. Damages sought by the Plaintiff, including pay and benefits received by Plaintiff and/or to which she was entitled or would have been entitled;

12. The identity and facts regarding any and all employees of Defendant who were demoted, disciplined, suspended, counseled, suspended, reprimanded, placed on leave, terminated, discharged and/or laid-off within the last ten (10) years under and/or for the same policy, procedure, rule and/or regulation that was utilized and implemented by the Defendant with regard to Plaintiff(s);

13. The identity and facts regarding any and all employees of Defendant who could have been but were not demoted, disciplined, suspended, counseled, suspended, reprimanded, placed on leave, terminated, discharged and/or laid-off within the last ten (10) years under and/or

for the same policy, procedure, rule and/or regulation that was utilized and implemented by the Defendant with regard to Plaintiff(s), including those employees that were simply given a warning, suspended and/or given other disciplinary measures other than termination;

14. The persons, supervisors and managers who participated in any manner in the decision to layoff, discipline and/or terminate Plaintiff;

15. The job duties, wages, job requirements, job description, job duties, pay grade, and position responsibilities of a person in Plaintiff's position o;

16. The names, titles, genders, original dates of hire, dates of any changes in title or grade, and salary of program directors, managers, and senior/executive directors from 2010 to 2015, including Ben Herr, Mike Quinn, Bill Moseley, Tim Trevino, Joe Ramos, Susan Lodge and Sherry Huckabay;

17. Employer handbook, policies, and procedures on hiring, pay increases and/or raises, promotions, position upgrades, and applications for the same;

18. Employer handbook, policies, and procedures on pay grades, seniority, the "HR Project Management Survey," and merit awards;

19. Plaintiff's complaints, inquiries into, questions about, and/or reports of unequal pay between men and women employees of Defendant and program directors or assistant program directors, including information provided by Plaintiff regarding her complaints;

20. Plaintiff's complaints, inquiries into, questions about, and/or reports of having job duties removed from her, including the Mobility Management Program removed from her control by Defendant;

22. Any contention that Defendant considered Plaintiff's pay was equal to that of her male peers based on her seniority, experience, job duties, skill, training, and/or pay grade at date of hire;

23. Any contention that Plaintiff did not perform work that required equal skill, effort and responsibility under similar working conditions of her male counterparts;

24. The job duties, wages, job requirements, job description, job duties, pay grade, and position responsibilities of Plaintiff;

25. Any determination regarding compensating Plaintiff, who made decisions regarding Plaintiff's compensation, and the amounts paid to her;

26. Any and all program directors hired from 2009 through 2015 and any determinations regarding pay or position, including any posting for said positions.

Respectfully Submitted,


By: /s/ Adam Poncio

      ADAM PONCIO
      Southern District I.D. 19487
      State Bar No. 16109800
      THOMAS N. CAMMACK, III
      State Bar No. 24073762
      ALAN BRAUN
      State Bar No.  24054488

      PONCIO LAW OFFICES
      A Professional Corporation
      5410 Fredericksburg Rd., Suite 109
      San Antonio, Texas 78229-3550
      Telephone:(210) 212-7979
      Facsimile:(210) 212-5880

ATTORNEYS FOR PLAINTIFF


**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the above and foregoing document has been served on this the 26th day of October, 2016, to the following:

      Charles S. Frigerio
      Hector X. Saenz
      Law Offices of Charles S. Frigerio
      111 Soledad, Suite 840
      San Antonio, TX 78205
      Tel:(210) 271-7877
      Fax:(210) 271-0602


      */s/ Thomas N. Cammack*
      **THOMAS N. CAMMACK, III**

EXHIBIT "B"

Transcript of the Testimony of

# Diane Doehne Rath

**Date:**

November 01, 2016

**Case:**

MARTHA SPINKS VS. ALAMO AREA COUNCIL OF GOVERNMENTS

Kim Tindall and Associates, LLC.
Phone:(210) 697-3400
Fax:(210) 697-3408
Email:ktindall@ktanda.com
Internet: www.KimTindallandAssociates.com

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   MARTHA SPINKS               §
                                 §
 4            PLAINTIFF,         §
                                 §
 5   VS.                         § CIVIL ACTION
     ALAMO AREA COUNCIL OF       §
 6   GOVERNMENTS,                § NO.: 5:15-CV-00749-RP
                                 §
 7            DEFENDANTS.        §

 8

 9

10              * * * * * * * * * * * * * * * * * * * * * * * * *
                   ORAL DEPOSITION OF
11
                   DIANE DOEHNE RATH
12
                   NOVEMBER 1, 2016
13
                * * * * * * * * * * * * * * * * * * * * * * * * *
14

15        ORAL DEPOSITION OF DIANE DOEHNE RATH, produced as

16   a witness at the instance of the PLAINTIFF, and duly

17   sworn, was taken in the above-styled and numbered cause

18   on NOVEMBER 1, 2016 from 10:21 a.m. to 11:39 a.m.,

19   before Angie Lozano, CSR, in and for the State of Texas,

20   reported by machine shorthand, at the Law Offices of

21   Charles S. Frigerio, 111 Soledad, Suite 840, San

22   Antonio, Texas, pursuant to the Federal Rules of Civil

23   Procedure and the provisions stated on the record or

24   attached hereto.

25
```

```
 1                    A P P E A R A N C E S

 2

   FOR THE PLAINTIFF, MARTHA SPINKS:
 3
        MR. ADAM PONCIO
 4      PONCIO LAW OFFICES
        5410 Fredericksburg Road
 5      Suite 109
        San Antonio, Texas  78229
 6      210.212.7979, 210.212.5880 fax
        salaw@msn.com
 7

 8   FOR THE DEFENDANT, ALAMO AREA COUNCIL OF GOVERNMENTS:

 9      MR. CHARLES S. FRIGERIO
        LAW OFFICES OF CHARLES S. FRIGERIO
10      111 Soledad
        Suite 840
11      San Antonio, Texas  78205
        210.271.7877, 210.271.0602 fax
12      lcsfrigeriolaw@sbcglobal.net

13

14   ALSO PRESENT:

15      MR. CLIFFORD C. HERBERG, JR. - General Counsel and
        Senior Director, AACOG
16

17

18

19

20                      *  *  *  *  *

21

22

23

24

25
```

1                              INDEX

2                                                            Page

3    Appearances....................................    2

4    Preliminary Proceedings........................    4

5    Examination by MR. PONCIO......................    4

6    Examination by MR. FRIGERIO....................   50

7

8    Changes and Signature..........................   57

9    Reporter's Certification.......................   59

10

11                         * * * * *

12                       EXHIBIT INDEX

13   Number              Description              Page Marked

14   Exhibit 1   Notice of Intention to Take Oral

15               Deposition of a Corporate

16               Representative                       4/5

17   Exhibit 2   Notice of Termination Memorandum     26

18   Exhibit 3   Employee List                        34

19   Exhibit 4   Charge of Discrimination             47

20   Exhibit 5   Amendment to Charge of Discrimination 48

21   Exhibit 6   Termination of Employment Memorandum  53

22

23

24

25

```
 1                  PRELIMINARY PROCEEDINGS
 2              (Exhibit Number 1 was marked.)
 3                    DIANE DOEHNE RATH,
 4      having been first duly sworn, testified as follows:
 5                       EXAMINATION
 6  BY MR. PONCIO:
 7      Q.  Good morning.  Can you please state your name for
 8  the record?
 9      A.  Diane Doehne Rath.
10      Q.  Okay.  Ms. Rath, you understand that you're here
11  as the Corporate Representative on behalf of the Alamo
12  Area Council of Governments?
13      A.  Yes, sir.
14      Q.  Okay.  Can you tell me your position with AACOG?
15      A.  I'm the Executive Director.
16      Q.  All right.  And as Executive Director, can you
17  tell me when it was that you first started as Executive
18  Director?
19      A.  Yes, I started December 14th of 2014.
20      Q.  Okay.  And is that when you began your official
21  duties at AACOG?
22      A.  Yes, sir.
23      Q.  All right.  And when was it that you were first
24  contacted about becoming Executive Director?
25      A.  Well, I applied for the job in the Spring after
```

 1   the Board of Directors had realized they were going to

 2   be posting the position, and then made it available.

 3   So, I applied for it at that time and went through the

 4   application process.

 5       Q.  The Spring of 2014?

 6       A.  Yes, sir.

 7       Q.  So, then March/April?

 8       A.  I think it was not posted, probably, until May or

 9   June.  It took them a little while.

10       Q.  All right.  So, you understand that, today,

11   you're here as the Corporate Representative regarding

12   areas that we've asked a Corporate Representative to

13   appear and testify in this case.  Do you understand

14   that?

15       A.  Yes, sir.

16       Q.  All right.  So, what I've handed you is Exhibit

17   Number 1.  And I'm going to go through those areas with

18   you.  Okay.  If you look at the second page, we list the

19   areas to examine a Corporate Representative.

20           And the first area is "Any investigation and

21   determination related to the complaints of termination

22   and/or any prior discipline and/or evaluations of the

23   Plaintiff," and that would be Martha Spinks.  Are you

24   here prepared to testify regarding that area?

25       A.  I can -- I am prepared to testify regarding the

1   termination of.  Any investigations about complaints or

2   prior discipline, I am not able to speak towards, but

3   the termination, I certainly am ready to address.

4      Q.  Okay.  What we've done is we've designated all

5   these areas, and we provided your Counsel with these

6   areas last week.  And we've asked for a Corporate

7   Representative to testify regarding those areas.

8          And you're saying you are not prepared to testify

9   regarding the complaints of Martha Spinks and/or any

10  prior discipline and/or evaluations of Martha Spinks; is

11  that what you're saying?

12     A.  I'm saying that I started, as you know,

13  December 14th, so I can only speak about those items

14  that I have knowledge of.  My understanding is that you

15  have taken testimony from people that were directly

16  involved with prior activities.  So, I am very prepared

17  to address the termination.

18     Q.  I know, but my question is very specific.  So,

19  you are not prepared to testify here today as a

20  Corporate Representative related to the complaints of

21  Martha Spinks; is that correct?

22     A.  I can only speak to those facts of which I have

23  knowledge, and I have no knowledge of anything preceding

24  December 14th, 2014.

25     Q.  Okay.  So, you recognize that she first asked for

```
 1   equal pay information in 2013?

 2       A.  That's my understanding, yes.

 3       Q.  All right.  You have no knowledge of that?

 4       A.  No, sir.

 5       Q.  You have no knowledge of the investigation

 6   regarding equal pay requests made by Martha Spinks in

 7   2013?

 8       A.  No, sir.

 9       Q.  You have no knowledge of equal pay requests for

10   information requested by Martha Spinks prior to December

11   of 2014?

12       A.  Correct.

13       Q.  You have no information or knowledge of any prior

14   evaluations of Martha Spinks prior to December of 2014?

15       A.  Correct.

16       Q.  You have no knowledge of any conduct of

17   Martha Spinks prior to December of 2014?

18       A.  Correct.

19       Q.  You have no knowledge of any prior discipline

20   related to Martha Spinks prior to December of 2014?

21       A.  I am aware that there was disciplinary action in

22   June, but I have not read that action and was not aware

23   of it before of termination.  I became aware of it in

24   documents that were submitted for this case, but I had

25   no knowledge of it before December and have not read it.
```

1      Q.  Okay.  So, you are not prepared to testify

2   regarding any discipline of Martha Spinks prior to

3   December of 2014?

4      A.  Correct.

5      Q.  The second area we asked for is "Any

6   investigation and determinations related to any

7   complaints of harassment, discrimination, termination

8   and/or retaliation by Plaintiff Martha Spinks."

9          Again, you have no knowledge of any EEOC

10   complaint filed by Martha Spinks regarding harassment,

11   discrimination and/or retaliation prior to December of

12   2014; is that correct?

13      A.  When I became employed, I had received a listing

14   of all the outstanding unemployment insurance, EEOC and

15   pending litigation.  So, I was aware that she had filed

16   an EEOC complaint, and then I was aware when they found

17   no basis and gave a right to sue, but I have no

18   knowledge of the details.

19      Q.  So, when you terminated Ms. Spinks in January of

20   2015, you were aware that she had previously filed an

21   EEOC complaint?

22      A.  I was aware there was one pending, but was not

23   aware of any of the details about it.

24      Q.  Okay.  When you made your determination to

25   terminate Ms. Spinks in January of 2015, you were aware

1    that she had also asked for an investigation from AACOG

2    regarding equal pay information and/or complaints?

3        A.  I was not aware of what she had asked for.  I was

4    only aware of a pending EEOC case.

5        Q.  And you were aware that that involved equal pay

6    complaints?

7        A.  I was not involved what the alleged grounds were.

8        Q.  So, you were not aware that she had made a sex

9    discrimination complaint?

10       A.  No, sir.

11       Q.  But when you made the decision to terminate her

12   in 2015, you were aware that she had made a prior

13   complaint against the company?

14       A.  I was aware there was a pending case, yes.

15       Q.  Okay.  Area Number 3, "The Employee Handbook and

16   Guidelines."  Are you prepared to testify regarding the

17   Employee Handbook and Guidelines here today?

18       A.  Yes, sir.

19       Q.  Okay.  With regard to the Employee Handbook and

20   Guidelines, can you tell me if the decision to terminate

21   Martha Spinks was discretionary under the Employee

22   Handbook and Guidelines?

23       A.  I believe the decision to terminate was based

24   upon the actions of Ms. Spinks.  I don't believe there's

25   anything that's mandatory.  Clearly, it was based upon

1   the core performance, the failure to fulfill her duties

2   and obligations, insubordination, failure to timely

3   submit reports that caused a great and serious damage to

4   the agency at that time.  So, it clearly was consistent

5   with the policies that were in effect.

6       Q.  My question is very specific.  Is it your

7   understanding that the decision to terminate Ms. Spinks

8   in January of 2015 was discretionary, according to your

9   Employee Handbook and Guidelines that were in effect at

10  that time?

11      A.  Yes, sir.  I believe most decisions to terminate

12  are discretionary, based upon the facts.

13      Q.  In other words, you could have suspended her,

14  right?

15      A.  I could have suspended her, yes, sir.

16      Q.  Under the Handbook and Guidelines?

17      A.  Uh-huh.  (Nods head affirmative).

18      Q.  You could have given her -- issued her a written

19  reprimand?

20      A.  I could have.

21      Q.  You could have, also, given her a Performance

22  Improvement Plan, as opposed to terminating her?

23      A.  Yes, sir.

24      Q.  Okay.  But it was your decision to terminate her?

25      A.  Yes, sir.

1      Q.  Did anyone else participate in that decision?

2      A.  No, sir.  I made the sole decision.  I consulted

3   HR consistent with our procedures to ensure that the

4   documentation was in order, but the decision was solely

5   mine, based upon what I personally experienced during

6   that month.

7      Q.  Who did you consult with in HR?

8      A.  Sherrie Huckabay, who was the Senior Director of

9   HR at the time.

10     Q.  And she is no longer with the agency?

11     A.  No, sir.

12     Q.  When you consulted with her, had you known

13  Sherrie Huckabay, or known of her reputation?

14     A.  I only met Sherrie when I -- the first time is

15  when I had my interview for the job was the first time I

16  had met her at all.  And then, did not -- saw her one

17  time before I started when I interviewed my Senior

18  Direct Reports before I started, and then when I became

19  employed.

20     Q.  Okay.  And did you find her to be a truthful and

21  honest person?

22     A.  Yes, sir.  I had no problems with her at that

23  time.

24     Q.  Okay.  At this time, do you have any opinion

25  regarding her truthfulness?

 1      A.  I have a personal experience with her where I

 2   believe outside attorneys found her to not be truthful.

 3      Q.  Okay.  And what was that experience?

 4      A.  She filed a complaint with our Board about my

 5   actions.  Our outside Counsel had hired a third party

 6   attorney to investigate, and that third party attorney

 7   found no substantiation for her allegations.

 8      Q.  Who was the third party attorney?

 9      A.  It was an attorney out of New Braunfels, who is

10   Labor Law and Human Resources, and I can't remember her

11   name at this time.  I'm sorry.  I'd recognize it, but I

12   don't remember her name.

13      Q.  And Huckabay came to you and offered her notice

14   of resignation; is that correct?

15      A.  No, she did not come to me.  After she had

16   vacated her office, she e-mailed me a notice of

17   resignation.

18      Q.  Okay.  And did she give you two weeks' notice?

19      A.  She gave me two -- at least, two weeks' notice.

20   It might have been more, at least, two weeks' notice.

21      Q.  But rather than take two weeks' notice, you

22   decided to make her termination or resignation effective

23   immediately?

24      A.  I immediately accepted her resignation.  We paid

25   out her notice period.

 1      Q.  And with regard to her complaints, do you know

 2   what the nature of her complaints were?

 3      A.  Against me?

 4      Q.  Yes.

 5      A.  Yes.  She alleged that I was abusive towards her

 6   and did not treat her with respect.  She took exception

 7   to a term I used to describe the atmosphere in her

 8   department.

 9      Q.  With regard to the termination, did you ever

10   confer with her or consult with her prior to terminating

11   Ms. Spinks?

12      A.  As I said earlier, I discussed with her to ensure

13   that the documentation was complete and in order.  I did

14   not seek her opinion regarding the termination.

15      Q.  Prior to you making the termination decision, did

16   you ever confer with Tim Trevino?

17      A.  No, sir.  He was out of the country on Christmas

18   until he returned just after the first of the year.

19      Q.  Prior to your starting with AACOG, had you ever

20   conferred with Tim Trevino regarding the termination or

21   conduct of Martha Spinks?

22      A.  No, sir.

23      Q.  All right.  So, there was never a meeting between

24   you, Sherrie Huckabay and Tim Trevino regarding

25   Ms. Spinks?

1      A.   Certainly, not before I began employment.

2      Q.   After employment?

3      A.   I do not recall a meeting after Mr. Trevino

4   returned from Mexico.  I made the decision and had made

5   the decision.  I do not recall such a meeting, but I

6   cannot say it did not take place.  There is a

7   possibility that, perhaps, there was a conversation.

8      Q.   So, you do not recall prior to your making the

9   decision that Mr. Trevino recommended that you terminate

10  Ms. Spinks?

11     A.   Oh, I definitely recall that did not happen.  No,

12  I had absolutely no input into making that

13  determination.

14     Q.   So, when you say you don't recall a meeting with

15  Mr. Trevino, I don't understand your answer.

16     A.   There might have been a conversation at which

17  Mr. Trevino and Ms. Huckabay were present, where we

18  discussed the upcoming termination because Ms. Spinks

19  reported to Mr. Trevino and did determine what our next

20  steps of action would be.  That would be a logical

21  progression in order to be prepared for business

22  continuation, but I don't, specifically, recall that

23  meeting, but it would be consistent with good practice

24  to have had a discussion to discuss next steps.

25     Q.   So, you don't recall whether you ever asked

 1    Mr. Trevino for a recommendation?

 2       A.  A recommendation regarding?

 3       Q.  Ms. Spinks.

 4       A.  Oh, I do recall I did not ask for a

 5    recommendation.  I made that determination based upon

 6    five specific actions.

 7       Q.  Okay.  Do you recall ever asking Ms. Huckabay for

 8    a recommendation?

 9       A.  No, I'm sure I did not ask her for a

10    recommendation.  I told her my decision and wanted to

11    ensure that the documentation was such to justify a

12    termination.

13       Q.  So, prior to your termination --

14       A.  And let me just also complete.  Ms. Huckabay was

15    aware of the progression of the issues and the number of

16    instances as they occurred.  So, it's not like there was

17    nothing, and then here's a full package.  As I

18    encountered so many difficulties and issues that were

19    presenting themselves, I did keep HR informed of those.

20    So, she was aware of the progression and increasing

21    number of difficulties, particularly, at the end.

22       Q.  Who was aware?

23       A.  Ms. Huckabay.

24       Q.  So, with regard to Item Number 4, you have been

25    designated to testify regarding any harassment,

 1    discrimination and retaliation policy related to

 2    Plaintiff's claim.  Are you here prepared to testify

 3    regarding that area?

 4        A.  I can't discuss harassment discrimination and

 5    retaliation, no, sir.

 6        Q.  So, you're not here --

 7        A.  I can discuss our HR policies and how that would

 8    fall into it, but not anything with specifics regarding

 9    Ms. Spinks.

10        Q.  So, you're not here prepared to testify regarding

11    any harassment policy related to Plaintiff's claim?

12        A.  I can discuss the policy, in general, but not

13    regarding the specifics of Ms. Spinks' claim.

14        Q.  And the same thing with regard to discrimination

15    or retaliation?

16        A.  Yes, sir.

17        Q.  All right.  So, your policy, in general, does not

18    allow for retaliation; is that correct?

19        A.  Absolutely correct.

20        Q.  All right.  So, if she complained about an equal

21    pay violation and suffered retaliation, that would be a

22    violation of your policies?

23        A.  It would be a violation, yes, sir.

24        Q.  If she complained about sex discrimination and

25    suffered retaliation, that would be a violation of your

 1  policy?

 2      A.  Yes, sir.

 3      Q.  All right.  And to whom would she have the

 4  obligation to report sex discrimination or equal pay

 5  violations to the company?

 6      A.  I would believe the Executive Director, her

 7  superior, the head of HR, or the Executive Director.

 8      Q.  Okay.  The next item we have is Item Number 5.

 9  "Benefits and pay the employee received and/or would

10  have received had she remained employed."  Are you

11  repaired to testify regarding that area?

12      A.  I know what her salary was at the time of her

13  termination, and increases we've had since that time,

14  and I'm aware of what our benefits are.

15      Q.  All right.  So, she was terminated in January of

16  2015; is that right?

17      A.  Yes, sir.

18      Q.  And prior to that, or after that, I'm sorry, in

19  2015, was there a general merit increase provided to the

20  employees of AACOG?

21      A.  We do not give general merit increases.  We give

22  cost-of-living increases, and there was no

23  cost-of-living increase in 2015.  We had a merit bonus

24  based upon performance that was awarded in March of

25  2015.

1    Q.   Okay.  And who received those bonuses?

2    A.   Those employees dependent upon their performance

3  evaluation.  So, those employees that scored, I believe,

4  a "4" and a "5" or a "3.5" and above, but it was

5  determined by the score on their annual evaluation

6  provided by their supervisor.

7    Q.   Okay.  And on June 12th of 2015, there was a

8  merit increase to all employees; is that correct?

9    A.   No, sir.

10   Q.   Okay.  Are you aware of what happened in June of

11 2014?

12   A.   I'm not aware of what happened in June of 2014.

13   Q.   Okay.  So, you don't know any facts regarding the

14 merit increases in June of 2014?

15   A.   No, sir.

16   Q.   All right.  How about in 2016, were there any

17 merit increases?

18   A.   2016, yes.  Previously, when I said March, there

19 was -- that might have been June when I said March,

20 2015, because it was one time that it was a merit bonus

21 in, both, 2015 and 2016.  Both based upon the employees'

22 appraisal by their supervisor, both based upon the top

23 performing number.  That could have been June of 2015.

24 The appraisals are complete in March.  So, whenever the

25 facts and the paperwork is in order.

1      Q.  Okay.  Do you know if AACOG gives any general

2    merit increases or cost-of-living increases to

3    employees?

4      A.  We have both provisions in our policy.  Both the

5    policy at the time and the policy now, because we do

6    have new policies.  We have a cost-of-living adjustment.

7    There was not one awarded in 2016.  There is a small one

8    budget, .33 for 2017 waiting for the final

9    determination.

10          We are able to give merit increases based upon

11    the recommendation of the supervisor and one level up,

12    based upon the availability of funds in the programs

13    budget.

14      Q.  Okay.  Is it your testimony here today that Tim

15    Trevino never asked or recommended that you terminate

16    Ms. Spinks?

17      A.  Yes, sir.

18      Q.  Item Number 6, we've asked for a Corporate

19    Representative to testify regarding any prior complaints

20    of or reports or inquiries regarding violations of the

21    Equal Pay Act or sex discrimination, wrongful

22    termination, and/or harassment, including those

23    involving the employees and/or supervisors involved in

24    the present matter.  Are you here prepared to testify

25    regarding that area?

 1        A.  I can discuss the termination of Ms. Spinks, but

 2   I can't discuss the broad specter.

 3        Q.  Okay.  Item Number 7, "Any investigation and/or

 4   background check conducted involving the employees

 5   and/or supervisors involved in the present matter,

 6   including investigations conducted regarding Plaintiff's

 7   complaints and/or requests regarding the Equal Pay Act

 8   and/or sex discrimination or retaliation."

 9        A.  Can you define "in the present matter"?  What

10   does that include?  Does that include the entire Spinks

11   case or the termination?

12        Q.  The entire Spinks case.

13        A.  I can only discuss the termination.

14        Q.  Okay.  So, you don't know what information was

15   provided to Ms. Spinks regarding her complaints,

16   regarding the Equal Pay Act or request for information;

17   is that correct?

18        A.  Correct.

19        Q.  You don't know how it was gathered?

20        A.  Correct.

21        Q.  You don't know what was produced?

22        A.  Correct.

23        Q.  And you cannot testify regarding her Equal Pay

24   Act violations?

25        A.  Allegations.

 1      Q.   Right.

 2      A.   Correct.

 3      Q.   The employee's personnel file and prior

 4   attendance and discipline and prior leave requests, do

 5   you have any information regarding Item 8?

 6      A.   No, I have not reviewed her personnel requests --

 7   I mean, her personnel file.

 8      Q.   Item Number 9, "Any defenses asserted by

 9   Defendant."  Are you prepared to testify regarding that

10   area?

11      A.   Regarding her termination or --

12      Q.   Any defenses you've asserted in this case?

13      A.   Oh, I'm sorry, by the Defendant.  I can totally

14   discuss any of the defenses regarding our termination --

15   the termination, and I can discuss the general salary

16   information that was submitted, but as far as defenses

17   for the remaining allegations, I'm not prepared to

18   discuss.

19      Q.   So, you're not prepared to testify regarding

20   defenses asserted regarding the Equal Pay Act?

21      A.   I can discuss the salaries of the employees that

22   we had at the time, and I'm aware of our salary surveys

23   and the salaries that our employees, managers,

24   supervisors, directors made.

25      Q.   But you don't know why those determinations were

1  made in 2014, regarding the salaries?

2    A.  Not any response about it.  I can just discuss

3  the facts of the salaries, the facts of the employees,

4  the facts of the salaries that they were receiving and

5  the facts of their gender, or whatever.

6    Q.  Well, the question is, for example, an Equal Pay

7  Act violation involves sex discrimination as between

8  males and females in the same or similar position as

9  Ms. Spinks --

10    A.  Correct.

11    Q.  -- in December 2014.

12    A.  Correct.

13    Q.  Do you know what the reasons for the pay

14  differences were?

15    A.  I can, certainly, say, as I stated, that I can

16  discuss the salaries that were paid at the time, and

17  there were no salary discrepancies.

18    Q.  Do you know why male employees were paid more

19  than Ms. Spinks in 2014?

20    A.  I don't believe that that general statement is

21  accurate.  When I review the facts and when I reviewed

22  the salaries at the time, there was consistency among

23  directors.  There was some women that were paid more

24  than Ms. Spinks and some men that were paid more than

25  Ms. Spinks.

1    Q.  I'm asking, specifically, about the males.

2    A.  And I'm, specifically, answering that there was

3  some women paid more and some men paid more.

4    Q.  That's not what I'm asking about.  I'm asking

5  about the male employees.  Do you --

6    A.  I can't discuss --

7    Q.  Wait.  Wait.  Wait.  Let me finish.  Do you know

8  why male employees were paid more than Ms. Spinks?

9              MR. FRIGERIO:  Objection, form.  You can go

10  ahead and answer, if you can.

11    A.  I do not believe that male employees, as a

12  general class, were paid more.  I believe you have to

13  look at the individual circumstance of each employee to

14  determine why each employee, regardless of gender,

15  received the salary that they received.

16    Q.  (BY MR. PONCIO) So, you're here prepared to

17  testify today regarding each male employee and why they

18  received the salary they did in 2014?

19    A.  No, sir.  I can't discuss the specifics of each

20  employee, male or female, and their salary.  I can just

21  repeat the salaries that they received consistent with

22  their position and their gender.

23    Q.  Okay.  And the same answer for 2013?

24    A.  Correct.

25    Q.  Okay.  Thank you.  Item Number 10, we asked for a

 1   Corporate Representative to testify regarding the claims

 2   made the basis of the present suit, including any and

 3   all determination and reasons for the termination of

 4   Plaintiff and related facts."  You are here prepared to

 5   testify regarding that area?

 6        A.   Regarding the termination, yes.

 7        Q.   But as to her claims of discrimination or

 8   retaliation, you're not prepared to testify regarding

 9   those facts?

10        A.   Only regarding the termination.

11        Q.   Okay.  So, just to be clear, you're not prepared

12   to testify here today regarding her claims of

13   discrimination?

14        A.   Correct.

15        Q.   Only the termination?

16        A.   Correct.

17        Q.   You're not prepared to testify here today

18   regarding her assertions of retaliation, only

19   termination?

20        A.   Well, clearly, retaliation, if that results in

21   her termination, because there was no retaliation

22   involved in the decision to terminate her.

23        Q.   Aside from the decision to terminate, as you

24   know, she previously filed an EEOC complaint against the

25   company?

1     A.  Correct.

2     Q.  And prior to that, she made complaints and

3  conducted investigations regarding what she perceived to

4  be sex discrimination and Equal Pay Act violations,

5  right?

6     A.  That's what I understand.

7     Q.  My question is, between her assertions of those

8  claims and her termination, she asserts she was

9  subjected to retaliation.  Do you understand that?

10    A.  Yes, sir.

11    Q.  Okay.  You're not --

12    A.  I understand the question that you're phrasing.

13  I don't understand if she was.

14    Q.  So, you're not prepared to testify regarding any

15  assertions of retaliation in between her complaints and

16  termination; is that correct?

17    A.  Correct.

18    Q.  Okay.  Thank you.  Item Number 12, we asked for

19  the identity and facts regarding any and all employees

20  of Defendant who were demoted, disciplined, suspended,

21  counseled, suspended, reprimanded, placed on leave,

22  terminated, discharged and/or laid off within the last

23  ten years under and for the same policy, procedure, rule

24  and/or regulation that was utilized and implemented by

25  the Defendant with regard to Plaintiff.  Are you here

1  prepared to testify regarding that?

2      A.  I can testify that regarding the termination

3  there was no other employee that had that same set of

4  facts.

5      Q.  Well, when you initially decided to -- or

6  informed Ms. Spinks that you were terminating her, you

7  gave three reasons.  Do you recall that?

8      A.  I believe, there were five reasons.

9      Q.  Well, and we'll discuss that, but in your initial

10  memo, there were three reasons.  Do you understand that?

11      A.  There was one reason, but the different reasons

12  had like two examples of each.

13      Q.  Okay.  Let me show what you I'm going to mark as

14  Exhibit Number 2.

15              (Exhibit Number 2 was marked.)

16      Q.  (BY MR. PONCIO) And what I'm handing you is a

17  memo to Martha Spinks from yourself dated January 12th,

18  2015, and it's subject, it says, "Notice of

19  Termination"?

20      A.  Uh-huh.  (Nods head affirmative).

21      Q.  Okay.  In this memo, you go on to say, "I am

22  terminating your employment with AACOG for the following

23  violations of AACOG personnel policies."

24      A.  Correct.

25      Q.  Number 1, "Personnel Policy 3.104.

 1   Unsatisfactory job performance, incompetence or neglect

 2   of duty and insubordination."  That's one reason you

 3   list?

 4       A.  Yes, sir.

 5       Q.  Number 2, "Personnel Policy 3.008.01.  Reporting

 6   fraud or other illegal acts."  That's the second reason

 7   you give?

 8       A.  Correct.

 9       Q.  And then, you list a third reason, "Neglect of

10   duty for failure to submit DADS Quarterly Performance

11   Report, Quarter 1, by deadline and failure to submit

12   DADS FFATA certification form by deadline."  That's

13   Reason 3.

14       A.  Well, there's two reports, so I count that as two

15   because neglect of duty --

16       Q.  Under Item Number 3?

17       A.  Yes, sir.  You have neglect of duty.  You, also,

18   have -- that consists of failure to submit the DADS

19   Quarterly Performance Report and failure to submit the

20   DADS Certification Form.

21       Q.  Okay.  So, we have two reasons under Item 3, one

22   reason under Item 1, and one reason under Item 2?

23       A.  And Item 1 had two instances.  One was failure to

24   appropriately implement a grant, especially the rights

25   for Vets and insubordination.

1      Q.  Okay.

2      A.  So, Number 1 had two instances.

3      Q.  Okay.  So --

4      A.  For a total of five.

5      Q.  Did you later create another memo indicating what

6   the reasons for her termination were?

7      A.  No, I did not later create another document.

8   This is the document that was given to Ms. Spinks at the

9   time of termination.  There was another document that

10  was created that went to our Senior Director of HR

11  detailing the instances, the specific documentation of

12  that.

13     Q.  Okay.  And that later memo that you created, did

14  you give a copy to Ms. Spinks?

15     A.  I did not later create a document.  That document

16  was created before the termination, immediately

17  preceding the creation of this Notice of Termination

18  document.  And my understanding is that was provided

19  later to Ms. Spinks when she requested it.

20          And that is our procedure that we give the Notice

21  of Termination to any employee when they're terminated,

22  and if they want more information, they can request it.

23  And they will receive the more expanded document.

24     Q.  Okay.  And did the expanded document include more

25  than these five reasons you say are set out here in this

 1   memo?

 2      A.  It contains the five reasons with much more

 3   detail.

 4      Q.  Okay.  And I want to ask you about Item Number 2,

 5   "Reporting fraud or other illegal acts."

 6      A.  Yes.

 7      Q.  So, who did the fraud involve?

 8      A.  The reason for that one was because of

 9   Ms. Spinks' failure to report suspected fraud.  There

10   was no fraud upon an investigation review, but she

11   suspected fraud and failed to report it.  And the

12   individual she suspected was Nick Monreal, who led the

13   Ombudsman Program.

14      Q.  Okay.  And you're saying she never reported it to

15   anyone within AACOG?

16      A.  Correct.

17      Q.  Okay.  And are you aware of her ever reporting it

18   to Ms. Lodge?

19      A.  I am not aware of that at all.

20      Q.  Are you aware of --

21      A.  And may I finish that sentence, please?

22   Ms. Lodge was not to whom it should have been reported,

23   so she might have discussed it with Ms. Lodge, but our

24   personnel policy that you referenced earlier states that

25   she should report it to her immediate supervisor, who

1    was Mr. Trevino, the Executive Director or the Senior

2    Director of HR.

3        Q.  Okay.  And who was the Senior Director of HR at

4    that time?

5        A.  Ms. Huckabay.

6        Q.  Okay.  So, if she reported it to Ms. Huckabay,

7    then she would have complied with that regulation or

8    guideline?

9        A.  Had she reported it to Ms. Huckabay, that would

10   be correct.

11       Q.  And did you ever ask Ms. Huckabay if she reported

12   it to her?

13       A.  As we prepared for the termination, Ms. Huckabay

14   had said she had not reported it, had no knowledge of

15   it.

16       Q.  Okay.  So, you're saying that with regard to

17   Item 12, you're not aware of any other employee being

18   subjected to discipline for violation of Personnel

19   Policy 3.104, or do you know?

20       A.  And 3.104 is the -- oh, I'm not aware of any.

21   I'm certain there was, but I'm not aware of any

22   specifics.

23       Q.  So, you're not here prepared to testify regarding

24   that area?

25       A.  Only regarding Ms. Spinks.

1        Q.   Okay.  With regard to Personnel Policy 3.008.01,

2   you are not prepared to testify regarding any employee,

3   other than Ms. Spinks, as requested in Item 12?

4        A.   Correct.

5        Q.   Okay.  With regard to Item 3, "Neglect of duty or

6   failure to submit DADS Quarterly Performance Report,

7   Quarter 1, by deadline," you're not aware or not here

8   prepared to testify regarding any other employee who may

9   have violated that item, other than Ms. Spinks?

10       A.   I am not aware of any other employee ever failing

11  to submit that deadline, but I don't have a broad

12  knowledge of that.

13       Q.   Okay.  You didn't conduct any investigation --

14       A.   No, sir.  No, sir.

15       Q.   Okay.  So, you have no knowledge as to Item

16  Number 12, regarding any other employee with regard to

17  that particular violation?

18       A.   Correct.

19       Q.   And the second one in Item 3, under Exhibit

20  Number 2, "Failure to submit DADS FFATA Certification

21  Form by deadline."  You didn't conduct any investigation

22  regarding other employees who may have violated that

23  specific item?

24       A.   Correct.

25       Q.   So, you're not aware or prepared to testify here

1    today regarding any other employee, other than

2    Ms. Spinks?

3        A.  Correct.

4        Q.  Okay.  Thank you.  Item Number 13 in Exhibit 1 is

5    along the same lines, but it deals with employees who

6    could have, but were not terminated for those

7    violations.  You're not prepared to testify regarding

8    any employee, other than Ms. Spinks?

9        A.  Correct.

10       Q.  Okay.  Nor, did you conduct an investigation to

11   prepare to answer that question for today?

12       A.  No, sir.

13       Q.  Thank you.  Item Number 14, "The persons,

14   supervisors and managers who participated in any manner

15   in the decision to lay off, discipline and/or terminate

16   Plaintiff."  You've testified today regarding the

17   termination, but you're not aware of who participated in

18   any decision with regard to discipline of Ms. Spinks

19   prior to your termination of her; is that correct?

20       A.  Correct.  I'm not aware of any actions that were

21   taken regarding discipline prior to my starting in

22   December of 2014.

23       Q.  Okay.  And you're not prepared to testify

24   regarding that area as to prior discipline here today?

25       A.  Correct.

1      Q.   Thank you.  Item 15, "The job duties, wages, job

2   requirements, job description, job duties, pay grade and

3   position responsibilities of a person in Plaintiff's

4   position."  Are you prepared to testify here today

5   regarding those items?

6      A.   Regarding her position as the Director of the

7   Aging Program, I am certainly prepared to discuss that.

8      Q.   Item 16 --

9      A.   I would say, maybe, not pay grade because I

10  don't -- that's a level of HR dealing that I don't get

11  involved with pay grade.  Sorry.

12     Q.   Okay.  Item 16, "The names, titles, genders,

13  original dates of hire, dates of any changes in title or

14  grade, and salary of Program Directors, managers, and

15  Senior Executive Directors from 2010 to 2015."

16     A.   We have that report, and I'm prepared to discuss

17  that report with you.

18     Q.   Okay.  Which report?

19     A.   That has the names, titles, genders that respond

20  to Number 16.  So, I have that information.

21     Q.   Okay.  And it covers 2010 to 2015?

22     A.   Yes, sir.

23     Q.   All right.  So, tell me about Ben Herr.

24     A.   May I refer to the information?

25     Q.   Sure.

 1      A.  Because I do not know Ben Herr at all, but I can

 2   give you the information that we prepared to respond to

 3   that.  Ben Herr --

 4      Q.  Can I see the report that you're referring to?

 5      A.  Certainly.

 6      Q.  Do you mind if I copy it and mark it as an

 7   exhibit, so I can go along with you?

 8              MR. FRIGERIO:  Yes.

 9              MR. PONCIO:  Thank you.  Can I take a break?

10              MR. FRIGERIO:  Yeah.

11              MR. PONCIO:  Let's take a break for a

12   minute.

13      A.  Okay.

14              (Brief recess taken from 10:59 a.m. to

15              11:05 a.m.)

16      Q.  (BY MR. PONCIO) All right.  So, what I'm going to

17   do is I'm going to mark as Exhibit 3 the report that

18   you're referring to.  Okay?

19      A.  Yes, sir.

20              (Exhibit Number 3 was marked.)

21      Q.  (BY MR. PONCIO) Go ahead.  We were talking about

22   Mr. Herr.

23      A.  Yes.

24      Q.  I had asked you what you knew about the title or

25   pay grade and salary of Program Directors, managers, and

1  Senior Executive Directors from 2010 to 2015, including

2  Ben Herr.  And you said you have a report that you would

3  refer to to testify.  And my question is, did you do any

4  comparison between Ben Herr and Martha Spinks?

5      A.  I did not, specifically, look at Ben Herr and

6  Martha Spinks.  I did look at the Directors, in general,

7  and compared the range for Directors, in general.

8      Q.  Okay.  So, with regard to Ben Herr and

9  Martha Spinks, you are not prepared to testify here

10  today regarding any potential equal pay as to the pay

11  differences between Ben Herr and Martha Spinks?

12      A.  I can report to you that the salary of Mr. Herr,

13  but not to why that salary, the responsibilities of

14  employees, the particulars regarding that position.

15      Q.  Okay.  So, you can say here's what his salary is?

16      A.  Yes, sir.

17      Q.  But not the reasons for that?

18      A.  Correct.

19      Q.  All right.  And was he in a same or similar

20  position as Martha Spinks?

21      A.  He was a Director of a department, yes, sir.

22      Q.  Okay.  Mike Quinn, was he in same or similar

23  position as Martha Spinks?

24      A.  It depends upon at what point in the career

25  because Michael Quinn was a Director of a department,

 1   and eventually, was Deputy Executive Director of the

 2   agency.  So, you have to have the specific time period

 3   and salary related to that position.

 4       Q.  Okay.  So, Martha Spinks started in on June 1st

 5   of 2009, right?

 6       A.  Yes, sir.

 7       Q.  And was he a Program Director in June of 2009,

 8   Mike Quinn?

 9       A.  I have -- I agree that Martha started June 1st of

10   2009 as a Director, and mine has that Michael Quinn

11   started in March of 2010 as a Director.

12       Q.  Okay.  When he started, was he in a same or

13   similar position as Ms. Spinks?

14       A.  They, both, were Department Directors, yes, sir.

15       Q.  Okay.  And what was Mr. Quinn's pay at that time?

16       A.  $63,585.

17       Q.  And what was the pay of Ms. Spinks at that time?

18       A.  Well, at that time, I don't know.  Her pay when

19   she started in 2009 was $60,569.

20       Q.  Okay.  So, you made no determination regarding

21   the reasons for any pay differences between Mike Quinn

22   and Martha Spinks in 2009 or 2010; is that right?

23       A.  I did not because I don't know what Ms. Spinks

24   was making in 2010.  There might have been an adjustment

25   or a cost-of-living increase.  I can't speak to that,

 1  but I did not analyze any reasons for the differential

 2  between their salaries in June of 2009 when Mr. Quinn

 3  started in March of 2010, no.

 4      Q.  And when did --

 5      A.  In my opinion, they were very comparable.  I

 6  mean, certainly, within the same range.

 7      Q.  When did he become Assistant Executive Director?

 8      A.  It purports that it was in June of 2011.

 9      Q.  All right.  So, between June of 2010 and June of

10  2011, you don't know what the reasons were for any pay

11  difference between Mike Quinn and Ms. Spinks?

12      A.  No, sir.

13      Q.  All right.  Bill Moseley, when did he start with

14  the agency?

15      A.  Mr. Moseley started in April of 2013.

16      Q.  All right.  And what was he earning?

17      A.  $63,648.

18      Q.  Do you know what Ms. Spinks was earning at that

19  time?

20      A.  I don't know what she was earning at that time.

21      Q.  Okay.  Do you know of any subsequent pay

22  increases for Bill Moseley?

23      A.  By the time in January of 2016, after

24  cost-of-living and merit increases, he was making

25  $78,000.

```
 1       Q.  What about December of 2015, do you know what he

 2   was earning?

 3       A.  December of 2015, there would not have been an

 4   increase between 20 -- well, he did have additional

 5   duties in June, so I can't speak to that, not with

 6   certainty, no, sir.

 7       Q.  Okay.  So, you don't know the reasons for any pay

 8   differences between Bill Moseley and Ms. Spinks from the

 9   time of his hiring up until the time of the termination

10   of Ms. Spinks?

11       A.  Not regarding their specific responsibilities or

12   duties, no.

13       Q.  Okay.  Or pay?

14       A.  Or pay.

15       Q.  Tim Trevino, was he ever in the same or similar

16   position as Ms. Spinks?

17       A.  Oh, he was hired as a Public Relations Director

18   in August of 2009.

19       Q.  Okay.  Was he in a same or similar position as

20   Ms. Spinks?

21       A.  Yes, sir.

22       Q.  All right.  And from 2009 to January of 2015, are

23   you aware of the reason for any pay differences between

24   Tim Trevino and the -- I'm sorry, and the pay of

25   Ms. Spinks?
```

 1        A.   Certainly, he was promoted and was a Senior

 2   Director, and then was an Interim Co-Executive Director

 3   of the agency.  So, he certainly had a much broader area

 4   of responsibility and had pay increases reflecting that.

 5        Q.   Okay.  And what --

 6        A.   Because the Director and Senior Director are very

 7   different positions.

 8        Q.   All right.  So, you felt he was in a different

 9   position than Ms. Spinks when he became a Senior

10   Director?

11        A.   I don't feel, he was in a different position.

12   The agency only had four Senior Directors.  We had

13   multiple directors.

14        Q.   And when did he become Senior Director?

15        A.   He became Senior Director in January of 2012.

16        Q.   Do you know the reason for any pay differences

17   between Mr. Trevino and Ms. Spinks from 2009 to January

18   of 2012?

19        A.   Well, I think what is important is that

20   Mr. Trevino, when he started in August of 2009, made

21   $60,569, and Ms. Spinks, when she started in June of

22   2009, made the same salary.  So, I think that is what is

23   important, not increases that Mr. Trevino had

24   accompanying promotions.

25        Q.   Well, in January of 2012, before his promotion to

```
 1    Senior Director, or rather, December of 2011, do you
 2    know what his pay was at that time?
 3        A.  No, sir.
 4        Q.  So, you cannot testify regarding the reasons for
 5    any pay differences between Mr. Trevino and Ms. Spinks
 6    in 2011?
 7        A.  Correct.
 8        Q.  All right.  Joe Ramos, who is he?
 9        A.  Joe Ramos was an employee that started as a --
10    with the agency in '06 as a manager, and gradually was
11    promoted.
12        Q.  When did he become a Program Director?
13        A.  He became a Director in March of 2010.
14        Q.  All right.  And do you know what he was earning
15    in March of 2010?
16        A.  In March of 2010, he was making $60,569.
17        Q.  And in January of 2015, do you know what he was
18    earning?
19        A.  He resigned in June of -- in June of 2015, he
20    resigned.  So, I don't have -- I have a December of
21    2014.
22        Q.  What was he earning at that time?
23        A.  In December 2014, but he was a Senior Director,
24    not a Director.  He had, also, served as the Interim
25    Co-Executive Director of the agency, similar to
```

 1    Mr. Trevino, and then he resumed his original duties.

 2    And he was receiving, in December of 2014, $99,450 as a

 3    Senior Director of the agency.

 4         Q.  When was it that Mr. Ramos became a Senior

 5    Director?

 6         A.  He became a Senior Director in August 2010.

 7         Q.  Do you know what he was earning prior to his

 8    promotion to Senior Director in August of 2010?

 9         A.  He as we discussed earlier, in March of 2010,

10    when he became a Director, he and Ms. Spinks received

11    the same salary that Ms. Spinks was hired at.  And then

12    a little over a year, a year-and-a-half later, when he

13    received his promotion to Senior Director, he was making

14    $79,019.

15         Q.  Okay.  So, he became Senior Director, you had

16    testified in August of 2010?

17         A.  August of 2011.

18         Q.  2011, I'm sorry.  In July of 2010, do you know

19    what he was earning?

20         A.  No, sir.  The last documentation is that in March

21    of 2010, when he was promoted to Director with $60,569,

22    it would be highly unusual to have received an increase

23    three months later.

24         Q.  Okay.  Thank you.  Item 17, we've asked for a

25    Corporate Representative to testify regarding the

1   employer handbook, policies and procedures on hiring,

2   pay increases and/or raises, promotions, position

3   upgrades and applications for the same.  Are you

4   prepared to testify regarding those areas?

5       A.  Yes, sir.

6       Q.  Are you familiar with those policies during 2014?

7       A.  Yes, sir.

8       Q.  2013?

9       A.  There were amendments to the policies in 2012,

10  '13 and '14, so I'm familiar with the policies that were

11  in effect in 2014.  I cannot speak with specificity if

12  they were exactly the same as 2013.  There might have

13  been a change.  I can't speak to that.

14      Q.  All right.  Who was it that made, in 2014, made

15  decisions regarding the rate of pay for new hires?

16      A.  We had a pay classification.  There was a general

17  salary review done in 2011, and we really conformed to

18  those decisions, adjusted for cost-of-living increases.

19      Q.  Okay.

20      A.  So, you would have the pay range for each

21  position, and that would be a recommendation from the

22  Program Manager, Program Director, the Hiring Manager to

23  HR.

24      Q.  But you're not familiar with regard to what the

25  policies were in 2013?

 1      A.  I can't speak with specificity to '13 because

 2   there were a few amendments.

 3      Q.  So, Ms. Spinks was terminated in January of 2015;

 4   is that correct?

 5      A.  January of 2015, yes, sir.

 6      Q.  Okay.  Thank you.  Item Number 18, we've asked

 7   for a Corporate Representative to testify regarding the

 8   employer handbook policies and procedures on pay grades,

 9   seniority, and the HR Project Management Survey and

10   merit awards.  Are you here prepared to testify

11   regarding that area?

12      A.  I can discuss, as I said before, the handbook

13   policies and procedures, and seniority.  I cannot

14   discuss the HR Project Management Survey.  I'm aware

15   there was one done, but the specifics of it, I can't

16   discuss, except that it did define our categories, our

17   pay grades, our salary ranges.  We, certainly, complied

18   with that in 2011, and continued to comply with as it

19   was applied thereafter.

20      Q.  Item Number 19, we've asked for a Corporate

21   Representative to testify regarding Plaintiff's

22   complaints, inquiries into, questions about and/or

23   reports of unequal pay between men and women employees

24   of Defendant and Program Directors or Assistant Program

25   Directors, including information provided by Plaintiff

 1   regarding her complaints.  And I believe, earlier, you

 2   testified you're not prepared to testify regarding that

 3   item?

 4       A.  Correct.

 5       Q.  Item 20, "Plaintiff's complaints, inquiries into

 6   questions about and/or reports of having job duties

 7   removed from her, including the Mobility Management

 8   Program removed from her control by Defendant."  Are you

 9   prepared to testify regarding that area?

10       A.  I'm familiar with the circumstances, as it was

11   discussed in her unemployment insurance hearing, and I'm

12   prepared with the history leading up to the

13   insubordination for which she was terminated.  So, I am

14   prepared to discuss her dissatisfaction and her actions

15   after the Mobility Management Program was removed from

16   her.

17       Q.  Okay.  So, if I have questions regarding the

18   reasons and facts leading up to the removal of that

19   program from her, you're not prepared to testify

20   regarding that?

21       A.  No, sir.  That would have been Mr. Trevino.

22       Q.  Item 22.  I skipped "21" for some reason.  "Any

23   contention that Defendant considered Plaintiff's pay was

24   equal to that of her male peers, based on her seniority,

25   experience, job duties, skill, training and/or pay grade

 1   at date of hire."  You're not familiar with that area?

 2       A.  Well, I'm very familiar with reviewing the pay

 3   that was in place and the pay ranges.  There was no

 4   discrepancy.  It was very -- I mean, if you look at

 5   individuals, you will see the same pay, male, female

 6   differences.  The individual differences, based upon

 7   their responsibilities and their performance, I'm not

 8   prepared to discuss, but the general category of

 9   position and pay grade, I can discuss.

10       Q.  But you're not familiar with the determinations

11   made at the date of her hire?

12       A.  Oh, certainly, not.

13       Q.  Or, her subsequent increases in pay?

14       A.  No, sir.

15       Q.  Okay.  You're only familiar with facts after

16   December of 2014 when you started with the agency?

17       A.  Correct.

18       Q.  Item 24, "The job duties, wages, job

19   requirements, job description, job duties, pay grade and

20   position responsibilities of Plaintiff."  Prior to

21   December of 2014, are you familiar with those facts

22   regarding Ms. Spinks?

23       A.  I'm familiar from December of 2014, but the

24   position did not really change, except for Mobility

25   Management immediately preceding when I started.  So,

1   the position of Director of the Aging Program, I'm

2   familiar with.

3       Q.   Okay.  What about prior to December of 2014?

4       A.   As I said, the position really did not change,

5   except for removing Mobility Manager.  So, I am familiar

6   with it.

7       Q.   Item 25, "Any determination regarding

8   compensating Plaintiff, who made decisions regarding

9   Plaintiff's compensation, and the amounts paid to her."

10  Are you prepared to testify regarding that area?

11      A.   No, sir.  That would have been Mr. Trevino who

12  was her supervisor.

13      Q.   Item 26, "Any and all Program Directors hired

14  from 2009 through 2015 and any determinations regarding

15  pay or position, including any posting for said

16  positions."  Are you prepared to testify regarding that

17  area?

18      A.   No, sir.

19      Q.   Who would that be?

20      A.   When you go back to 2009, that's covering many

21  people within the agency.  Certainly, covering a portion

22  of it in a more recent past would be our manager of HR,

23  Deedra Johnson, at this time.

24      Q.   But you're not sure up to December 2014, who

25  would testify regarding that area?

 1      A.  I'm not sure going back to 2009 who would testify

 2   regarding that area.

 3      Q.  Okay.  So, let me show you what I'm marking as

 4   Exhibit Number 4.

 5               (Exhibit Number 4 was marked.)

 6      Q.  (BY MR. PONCIO) And for the record, this is a

 7   copy of the EEOC Charge with attached statement provided

 8   to the EEOC in July of 2014.  Had you seen that before?

 9      A.  I have not seen this document.  I was aware, and

10   I did read the EEOC final determination when they did

11   not substantiate it or find any grounds for it, but I

12   did not read the initial Charge of Discrimination, only

13   their final disposition of it.

14      Q.  So, when was it that you first read the EEOC's

15   final determination?

16      A.  When they sent it to us, and I don't remember the

17   specific date.  I'm sorry.

18      Q.  But at the time between December of 2014, I

19   believe, you said it was of '14?

20      A.  Yes, sir.

21      Q.  And January of 2015 --

22      A.  Yes, sir.

23      Q.  -- when you terminated Ms. Spinks, had you read

24   this at all?

25      A.  No, sir.

1        Q.  But you were aware she had filed it?

2        A.  I was aware that she had filed an EEOC complaint,

3    but was not aware -- the determination had not been

4    issued by that point, to the best of my recollection.

5        Q.  Let me show you what I'm marking as Exhibit

6    Number 5.

7                (Exhibit Number 5 was marked.)

8        Q.  (BY MR. PONCIO) After Ms. Spinks was terminated,

9    she filed an amended Charge with the EEOC regarding her

10   termination.  Did you receive a copy of that?

11       A.  Yes, sir, I did.

12       Q.  Did you discuss it with anyone?

13       A.  I'm sure I mentioned it to HR at the time, but I

14   don't, specifically, recall that.  Receiving the Charge,

15   we would have copied it to HR, to our attorneys and

16   mentioned -- I'm sure we mentioned it, but I don't,

17   specifically, recall it.

18       Q.  Okay.  Prior to her termination, did you review

19   all the numerous awards that Ms. Spinks had received

20   while working with AACOG?

21       A.  No, sir.  My determination was based upon what I

22   experienced during that month of issues.

23       Q.  Okay.  Prior to her termination, had you reviewed

24   the charts that Ms. Spinks had provided to AACOG

25   regarding the pay differences and pay rates that she

1    submitted as part of her equal pay complaint?

2        A.  No, sir.

3        Q.  Prior to her termination, had you reviewed the

4    employee evaluations that Ms. Spinks had received from

5    2009 through 2014?

6        A.  No, sir.

7        Q.  Would --

8        A.  I was aware, to be complete, I was aware that

9    there was an issue with performance in June of 2014, but

10   I did not read that document and had no knowledge of the

11   specifics.

12       Q.  Who raised the issue of performance in June of

13   2014?

14       A.  I was aware that there were issues at a Board

15   meeting, and I don't know the specifics of who initially

16   raised it, but I was aware of an issue, but not the

17   specifics.

18       Q.  All right.  So, you don't know what the reasons

19   were for counseling of Ms. Spinks in July of 2014?

20       A.  No, sir.

21       Q.  And you're not familiar with the facts or

22   prepared to testify regarding the facts?

23       A.  No, sir.  That would have been her supervisor,

24   Mr. Trevino.

25               MR. PONCIO:  All right.  Can I have a break?

1    I think we're almost done.

2                  (Brief recess taken from 11:26 a.m. to

3                  11:30 a.m.)

4                  MR. PONCIO:  Okay.  For the record, we had

5    requested the designation of a Corporate Representative

6    to testify here today with regard to the areas that

7    we've covered today, and they've produced Diane Rath,

8    and not informed us of any other Corporate

9    Representative to testify regarding any of these areas.

10   So, with that, we pass the Witness.

11                 MR. FRIGERIO:  And for the record, we have,

12   in conversation with Counsel, mentioned that there may

13   have to be more than one individual to talk about other

14   issues.

15                 MR. PONCIO:  That's not the way you do it,

16   but we'll address that separately.  Thank you.

17                 MR. FRIGERIO:  Well, I'm not finished.

18                 MR. PONCIO:  Oh, I'm sorry.

19                      EXAMINATION

20   BY MR. FRIGERIO:

21      Q.  Ms. Rath, when did you become Executive Director

22   of AACOG?

23      A.  On December 14th of 2015.

24      Q.  Prior to becoming Executive Director, did you

25   know Martha Spinks?

1       A.   No, I did not.

2       Q.   When did you terminate Martha Spinks' employment

3    with AACOG?

4       A.   January 12th of 2016.

5       Q.   During that short one-month time frame, what was

6    the reason for your termination of Martha Spinks?

7       A.   During that month period, we had very serious

8    issues in the Aging Department.  Prior to my joining

9    AACOG, they had been awarded a grant from the Texas

10   Veterans Commission to launch a program, "Rights For

11   Vets."  And it was supposed to have launched July 1.

12          There was an audit by the funding agency in

13   October, and we received that report in December.  The

14   report was due in December, and I received the draft

15   response that was very inaccurate, that Ms. Spinks had

16   drafted.  It was very inaccurate, very incomplete and

17   had many suggestions that were inappropriate.

18          She was asking for contract modifications that

19   directly conflicted with the application we had

20   submitted.  In addition, during that time, there was

21   issues of insubordination with the operation of the

22   Rights for Vets Program.  And our performance was very,

23   very troubling, and we were very much at risk of having

24   that grant pulled by the Texas Veterans Commission.

25          In addition, as I mentioned, we had the issue

1    with monitoring report of Ombudsman Program.  And we

2    were responding to that monitoring report, and in that

3    discussion is when Ms. Spinks made the allegation of

4    fraud that she had not reported, which is -- I take

5    fraud very, very seriously.

6         And to have an unreported suspicion of fraud

7    directly contradicts our policies, as it caused a very

8    serious concern to me.  And then, at the end of

9    December, we had two very serious issues.  We had a

10   report that was due to our DADS funding agency that was

11   due December 19th.  We had received a reminder from the

12   agency that it had not been submitted on the due date.

13        Mr. Trevino had sent e-mails to Ms. Spinks asking

14   the status and asking, or ensuring that it would be

15   submitted by the extended due date of 5:00 o'clock that

16   same day.  And we received notification from one of her

17   reports, Robert Gamboa, the next day that it was

18   submitted a day late.

19        This was very important to me because when I

20   became Executive Director, the agency was really trying

21   to rebuild its reputation.  It was an agency that had

22   been through a very troubled time.  As I met with all of

23   our funders in Austin, I learned that we had a

24   reputation for being late with every single report.

25        Our reports always needed editing and correcting,

1   and we were setting about to really restore the agency's

2   reputation and restore the integrity of its programs,

3   both, in service and reporting.  And then --

4       Q.  Did you place all these five issues in a report

5   to HR?

6       A.  Yes, sir.

7       Q.  I believe, those have been detailed and provided

8   to Counsel, Bates 432 through 437, which I'd like to

9   make a copy of and just take a short break to make a

10  copy.

11      A.  Because I have one more.  You said four.  I have

12  five.

13                  (Brief recess taken from 11:35 a.m. to

14                  11:36 a.m.)

15                  (Exhibit Number 6 was marked.)

16      Q.  (BY MR. FRIGERIO) What I've marked as Deposition

17  Exhibit Number 6, is that the detail of the five

18  reasons?

19      A.  Yes, sir.  It includes, as I just mentioned,

20  four.  It includes a fifth one, which was very

21  important, including not submitting paperwork, which we

22  could not draw down any funds at the end of our fiscal

23  year.  And all of those instances are detailed in this

24  report, yes.

25      Q.  What do you mean you couldn't draw down any

1  funds?

2    A.  We went to draw down funds to pay our vendors and

3  to close out our books, and we were told that they were

4  not able to release any funds to us at the end of the

5  year because we had not submitted a required form.  That

6  form had been sent to Ms. Spinks on December 10th.  It

7  was due on December 15th.

8        And at the end of the month, it had not been

9  submitted.  So, we had to submit it on December 30th in

10  her absence.  I sent her an e-mail inquiring about it

11  and received no response until early January.

12    Q.  Did that affect AACOG's needs?

13    A.  It, certainly, affected us.  It could have

14  impacted our cash flow.  We had sufficient resources we

15  were able to pay our vendors at the end of the year, but

16  so many of our vendors are small non-profits that

17  delaying payment can have significant impact on them.

18        It could impact our ability to pay our employees.

19  So, it could have significantly -- we had resources, so

20  it didn't cause us to come to a standstill, but it's a

21  very serious issue when you're not able to draw down

22  your funding.

23    Q.  Since becoming Director of AACOG, have you been

24  able to make a determination as to whether or not males

25  and females are treated in an equal pay scenario?

 1      A.  Yes, sir.  I have reviewed the information, and

 2   there is no differential between males and females based

 3   on gender.  That really is based upon their performance,

 4   their responsibilities, the size of their budgets.

 5      Q.  There's an allegations in this lawsuit that you

 6   terminated Ms. Spinks, based on the fact that she is a

 7   female and that she was over the age of 40.  Do you have

 8   a response to that?

 9      A.  Well, I'm a female over the age of 60, so I,

10   certainly, can't see how that would come into play.

11      Q.  Are the sole reasons that you terminated

12   Ms. Spinks detailed in Exhibit Number 6?

13      A.  Yes, sir, they are.  As I mentioned, when I took

14   over the agency, we really had to rebuild the agency's

15   credibility, its reputation, both, in this community and

16   statewide.  So, I really needed my leadership team to

17   pull together to have high standards to really demand

18   accountability to have fairness and the implementation

19   of all of our policies and services, and I had high

20   expectations of my team.

21              MR. PONCIO:  Object to the responsiveness

22   beyond "Yes, sir."

23              MR. FRIGERIO:  I'll pass the Witness.

24              MR. PONCIO:  No further questions at this

25   time.  Thank you.  Thank you, ma'am.

1    (WHEREUPON, at approximately 11:39 p.m., the

2    deposition was concluded.)

3

4

5

6              *  *  *  *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Diane Doehne Rath

November 01, 2016
Page 57

```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:                  DATE OF DEPOSITION:

 3   DIANE DOEHNE RATH                 NOVEMBER 1, 2016

 4   PAGE/LINE              CHANGE              REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1  _____

2  _____

3        I, DIANE DOEHNE RATH, have read the foregoing

4  deposition and hereby affix my signature that same is

5  true and correct, except as noted herein.

6

7                        _____

8                        DIANE DOEHNE RATH
                         JOB NO. 34315
9

10  THE STATE OF _____ )

11  COUNTY OF _____ )

12        BEFORE ME, _____, on this day

13  personally appeared DIANE DOEHNE RATH, known to me (or

14  proved to me under oath of _____ or

15  through _____) (description of

16  identity card or other document) to be the person whose

17  name is subscribed to the foregoing instrument and

18  acknowledged to me that they executed the same for the

19  purposes and consideration therein expressed.

20        Given under my hand and seal of office this

21  _____ day of _____, _____.

22

23                        _____

24                        NOTARY PUBLIC IN AND FOR

25                        THE STATE OF _____

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3  MARTHA SPINKS              §
                              §
 4              PLAINTIFF,     §
                              §
 5  VS.                        §  CIVIL ACTION
                              §
 6  ALAMO AREA COUNCIL OF      §  NO.: 5:15-CV-00749-RP
    GOVERNMENTS,               §
 7                             §
                DEFENDANT.     §
 8

 9       ********************************
              REPORTER'S CERTIFICATION
10
                 ORAL DEPOSITION OF
11
                 DIANE DOEHNE RATH
12
                 NOVEMBER 1, 2016
13
         ********************************
14

15      I, ANGIE LOZANO, Certified Shorthand Reporter in and

16  for the State of Texas, hereby certify to the following:

17      That the Witness, DIANE DOEHNE RATH, was duly sworn

18  by the officer and that the transcript of the oral

19  deposition is a true record of the testimony given by

20  the Witness.

21      I further certify that pursuant to FRCP Rule 30(f)(1)

22  that the signature of the Deponent:

23      _____ was requested by the Deponent or a party

24  before the completion of the deposition and returned

25  within 30 days from date of receipt of the transcript.
```

1    If returned, the attached Changes and Signature Page

2    contains any changes and the reasons therefor;

3    _____ was not requested by the Deponent or a party

4    before the completion of the deposition.

5         That $_____ is the deposition officer's

6    charges to the _____ for

7    preparing the original deposition transcript and any

8    copies of exhibits;

9         I further certify that I am neither attorney, nor

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this testimony was taken.

12   Further, I am not a relative or employee of any attorney

13   of record in this cause, nor do I have a financial

14   interest in the action.

15        Subscribed and sworn to on this the _____ day of

16   _____, 2016.

17

18   _____

19   ANGIE LOZANO, CSR #2892
     Expiration Date:  12/31/2017

20   Kim Tindall & Associates, LLC
     210.697.3400, 210.697.3408 fax

21

22

23   JOB NO. 34315

24

25

Diane Doehne Rath

November 01, 2016
Index: $60,569..AACOG

**Exhibits**

**Rath Diane Ex 01**  3:14 4:2 5:16, 17 32:4

**Rath Diane Ex 02**  3:17 26:14,15 31:19,20

**Rath Diane Ex 03**  3:18 34:17,20

**Rath Diane Ex 04**  3:19 47:4,5

**Rath Diane Ex 05**  3:20 48:5,6,7

**Rath Diane Ex 06**  3:21 53:15,17 55:12

**$**

**$60,569**  36:19 39:21 40:16 41:21

**$63,585**  36:16

**$63,648**  37:17

**$78,000**  37:25

**$79,019**  41:14

**$99,450**  41:2

**0**

**06**  40:10

**1**

**1**  4:2 5:17 26:25 27:11,22,23 28:2 31:7 32:4 51:11

**10**  23:25

**10:59**  34:14

**10th**  54:6

**11:05**  34:15

**11:26**  50:2

**11:30**  50:3

**11:35**  53:13

**11:36**  53:14

**11:39**  56:1

**12**  25:18 30:17 31:3,16

**12th**  18:7 26:17 51:4

**13**  32:4 42:10 43:1

**14**  32:13 42:10 47:19

**14th**  4:19 6:13,24 50:23

**15**  33:1

**15th**  54:7

**16**  33:8,12,20

**17**  41:24

**18**  43:6

**19**  43:20

**19th**  52:11

**1st**  36:4,9

**2**

**2**  26:14,15 27:5,22 29:4 31:20

**20**  38:4 44:5

**2009**  36:5,7,10,19,22 37:2 38:18, 22 39:17,20,22 46:14,20 47:1 49:5

**2010**  33:15,21 35:1 36:11,22,24 37:3,9 40:13,15,16 41:6,8,9,16,18, 21

**2011**  37:8,10 40:1,6 41:17,18 42:17 43:18

**2012**  39:15,18,25 42:9

**2013**  7:1,7 23:23 37:15 42:8,12,25

**2014**  4:19 5:5 6:24 7:11,14,17,20 8:3,12 18:11,12,14 22:1,11,19 23:18 32:22 40:21,23 41:2 42:6,11, 14 45:16,21,23 46:3,24 47:8,18 49:5,9,13,19

**2015**  8:20,25 9:12 10:8 17:16,19, 23,25 18:7,20,21,23 26:18 33:15, 21 35:1 38:1,3,22 40:17,19 43:3,5 46:14 47:21 50:23

**2016**  18:16,18,21 19:7 37:23 51:4

**2017**  19:8

**21**  44:22

**22**  44:22

**24**  45:18

**25**  46:7

**26**  46:13

**3**

**3**  9:15 27:13,16,21 31:5,19 34:17, 20

**3.008.01**  27:5 31:1

**3.104**  26:25 30:19,20

**3.5**  18:4

**30th**  54:9

**33**  19:8

**4**

**4**  15:24 18:4 47:4,5

**40**  55:7

**432**  53:8

**437**  53:8

**5**

**5**  17:8 18:4 48:6,7

**5:00**  52:15

**6**

**6**  19:18 53:15,17 55:12

**60**  55:9

**7**

**7**  20:3

**8**

**8**  21:5

**9**

**9**  21:8

**A**

**a.m.**  34:14,15 50:2,3 53:13,14

**AACOG**  4:14,21 9:1 13:19 17:20 19:1 26:22,23 29:15 48:20,24

50:22 51:3,9 54:23

**AACOG'S** 54:12

**ability** 54:18

**absence** 54:10

**absolutely** 14:12 16:19

**abusive** 13:5

**accepted** 12:24

**accompanying** 39:24

**accountability** 55:18

**accurate** 22:21

**Act** 19:21 20:7,16,24 21:20 22:7 25:4

**action** 7:21,22 14:20

**actions** 9:24 12:5 15:6 32:20 44:14

**activities** 6:16

**acts** 27:6 29:5

**addition** 51:20,25

**additional** 38:4

**address** 6:3,17 50:16

**adjusted** 42:18

**adjustment** 19:6 36:24

**affect** 54:12

**affected** 54:13

**affirmative** 10:17 26:20

**age** 55:7,9

**agency** 10:4 11:10 36:2 37:14 39:3,12 40:10,25 41:3 45:16 46:21 51:12 52:10,12,20,21 55:14

**agency's** 53:1 55:14

**Aging** 33:7 46:1 51:8

**agree** 36:9

**ahead** 23:10 34:21

**Alamo** 4:11

**allegation** 52:3

**allegations** 12:7 20:25 21:17 55:5

**alleged** 9:7 13:5

**amended** 48:9

**amendments** 42:9 43:2

**amounts** 46:9

**analyze** 37:1

**and/or** 5:22 6:9,10 8:8,11 9:2 17:9 19:22,23 20:3,5,7,8 25:22,24 32:15 42:2 43:22 44:6,25

**annual** 18:5

**answering** 23:2

**application** 5:4 51:19

**applications** 42:3

**applied** 4:25 5:3 43:19

**appraisal** 18:22

**appraisals** 18:24

**appropriately** 27:24

**approximately** 56:1

**April** 37:15

**area** 4:12 5:20,24 8:5 9:15 16:3 17:11 19:25 21:10 24:5 30:24 32:24 39:3 43:11 44:9 45:1 46:10, 17,25 47:2

**areas** 5:12,17,19 6:5,6,7 42:4 50:6, 9

**asserted** 21:8,12,20

**assertions** 24:18 25:7,15

**asserts** 25:8

**Assistant** 37:7 43:24

**atmosphere** 13:7

**attached** 47:7

**attendance** 21:4

**attorney** 12:6,8,9

**attorneys** 12:2 48:15

**audit** 51:12

**August** 38:18 39:20 41:6,8,16,17

**Austin** 52:23

**availability** 19:12

**awarded** 17:24 19:7 51:9

**awards** 43:10 48:19

**aware** 7:21,22,23 8:15,16,20,22, 23,25 9:3,4,5,8,12,14 15:15,20,22 17:14 18:10,12 21:22 29:17,19,20

30:17,20,21 31:7,10,25 32:17,20 38:23 43:14 47:9 48:1,2,3 49:8,14, 16

---

**B**

---

**back** 46:20 47:1

**background** 20:4

**based** 9:23,25 10:12 11:5 15:5 17:24 18:21,22 19:10,12 44:24 45:6 48:21 55:2,3,6

**basis** 8:17 24:2

**Bates** 53:8

**began** 4:20 14:1

**behalf** 4:11

**Ben** 33:23 34:1,3 35:2,4,5,8,11

**benefits** 17:9,14

**Bill** 37:13,22 38:8

**Board** 5:1 12:4 49:14

**bonus** 17:23 18:20

**bonuses** 18:1

**books** 54:3

**Braunfels** 12:9

**break** 34:9,11 49:25 53:9

**broad** 20:2 31:11

**broader** 39:3

**budget** 19:8,13

**budgets** 55:4

**business** 14:21

---

**C**

---

**career** 35:24

**case** 5:13 7:24 9:4,14 20:11,12 21:12

**cash** 54:14

**categories** 43:16

**category** 45:8

**caused** 10:3 52:7

**certainty** 38:6

Diane Doehne Rath

**certification** 27:12,20 31:20

**change** 42:13 45:24 46:4

**Charge** 47:7,12 48:9,14

**charts** 48:24

**check** 20:4

**Christmas** 13:17

**circumstance** 23:13

**circumstances** 44:10

**claim** 16:2,11,13

**claims** 24:1,7,12 25:8

**class** 23:12

**classification** 42:16

**clear** 24:11

**close** 54:3

**Co-executive** 39:2 40:25

**Commission** 51:10,24

**community** 55:15

**company** 9:13 17:5 24:25

**comparable** 37:5

**compared** 35:7

**comparison** 35:4

**compensating** 46:8

**compensation** 46:9

**complained** 16:20,24

**complaint** 8:10,16,21 9:9,13 12:4
24:24 48:2 49:1

**complaints** 5:21 6:1,9,20 8:7 9:2,
6 13:1,2 19:19 20:7,15 25:2,15
43:22 44:1,5

**complete** 13:13 15:14 18:24 49:8

**complied** 30:7 43:17

**comply** 43:18

**concern** 52:8

**concluded** 56:2

**conduct** 7:16 13:21 31:13,21
32:10

**conducted** 20:4,6 25:3

**confer** 13:10,16

**conferred** 13:20

**conflicted** 51:19

**conformed** 42:17

**considered** 44:23

**consistency** 22:22

**consistent** 10:4 11:3 14:23 23:21

**consists** 27:18

**consult** 11:7 13:10

**consulted** 11:2,12

**contacted** 4:24

**contention** 44:23

**continuation** 14:22

**continued** 43:18

**contract** 51:18

**contradicts** 52:7

**control** 44:8

**conversation** 14:7,16 50:12

**copied** 48:15

**copy** 28:14 34:6 47:7 48:10 53:9,
10

**core** 10:1

**Corporate** 4:11 5:11,12,19 6:6,20
19:18 24:1 41:25 43:7,20 50:5,8

**correct** 6:21 7:12,15,18 8:4,12
12:14 16:18,19 18:8 20:17,18,20,
22 21:2 22:10,12 23:24 24:14,16
25:1,16,17 26:24 27:8 29:16 30:10
31:4,18,24 32:3,9,19,20,25 35:18
40:7 43:4 44:4 45:17

**correcting** 52:25

**cost-of-living** 17:22,23 19:2,6
36:25 37:24 42:18

**Council** 4:12

**Counsel** 6:5 12:5 50:12 53:8

**counseled** 25:21

**counseling** 49:19

**count** 27:14

**country** 13:17

**covered** 50:7

**covering** 46:20,21

**covers** 33:21

**create** 28:5,7,15

**created** 28:10,13,16

**creation** 28:17

**credibility** 55:15

---

**D**

**DADS** 27:10,12,18,20 31:6,20
52:10

**damage** 10:3

**date** 45:1,11 47:17 52:12,15

**dated** 26:17

**dates** 33:13

**day** 52:16,17,18

**deadline** 27:11,12 31:7,11,21

**dealing** 33:10

**deals** 32:5

**December** 4:19 6:13,24 7:10,14,
17,20,25 8:3,11 22:11 32:22 38:1,3
40:1,20,23 41:2 45:16,21,23 46:3,
24 47:18 50:23 51:13,14 52:9,11
54:6,7,9

**decided** 12:22 26:5

**decision** 9:11,20,23 10:7,24 11:1,
2,4 13:15 14:4,5,9 15:10 24:22,23
32:15,18

**decisions** 10:11 42:15,18 46:8

**Deedra** 46:23

**Defendant** 21:9,13 25:20,25 43:24
44:8,23

**defenses** 21:8,12,14,16,20

**define** 20:9 43:16

**delaying** 54:17

**demand** 55:17

**demoted** 25:20

**department** 13:8 35:21,25 36:14
51:8

**dependent** 18:2

Diane Doehne Rath

**depends** 35:24

**deposition** 53:16 56:2

**Deputy** 36:1

**describe** 13:7

**description** 33:2 45:19

**designated** 6:4 15:25

**designation** 50:5

**detail** 29:3 53:17

**detailed** 53:7,23 55:12

**detailing** 28:11

**details** 8:18,23

**determination** 5:21 8:24 14:13 15:5 19:9 24:3 36:20 46:7 47:10,15 48:3,21 54:24

**determinations** 8:6 21:25 45:10 46:14

**determine** 14:19 23:14

**determined** 18:5

**Diane** 4:3,9 50:7

**difference** 37:11

**differences** 22:14 35:11 36:21 38:8,23 39:16 40:5 45:6 48:25

**differential** 37:1 55:2

**difficulties** 15:18,21

**Direct** 11:18

**directly** 6:15 51:19 52:7

**Director** 4:15,16,18,24 11:8 17:6,7 28:10 30:1,2,3 33:6 35:21,25 36:1, 7,10,11 37:7 38:17 39:2,6,10,14,15 40:1,12,13,23,24,25 41:3,5,6,8,10, 13,15,21 42:22 46:1 50:21,24 52:20 54:23

**directors** 5:1 21:24 22:23 33:14, 15 34:25 35:1,6,7 36:14 39:12,13 43:24,25 46:13

**discharged** 25:22

**disciplinary** 7:21

**discipline** 5:22 6:2,10 7:19 8:2 21:4 30:18 32:15,18,21,24

**disciplined** 25:20

**discrepancies** 22:17

**discrepancy** 45:4

**discretionary** 9:21 10:8,12

**discrimination** 8:7,11 9:9 16:1,4, 14,24 17:4 19:21 20:8 22:7 24:7,13 25:4 47:12

**discuss** 14:24 16:4,7,12 20:1,2,13 21:14,15,18,21 22:2,16 23:6,19 26:9 33:7,16 43:12,14,16 44:14 45:8,9 48:12

**discussed** 13:12 14:18 29:23 41:9 44:11

**discussion** 14:24 52:3

**disposition** 47:13

**dissatisfaction** 44:14

**document** 28:7,8,9,15,18,23,24 47:9 49:10

**documentation** 11:4 13:13 15:11 28:11 41:20

**documents** 7:24

**Doehne** 4:3,9

**draft** 51:14

**drafted** 51:16

**draw** 53:22,25 54:2,21

**due** 51:14 52:10,11,12,15 54:7

**duly** 4:4

**duties** 4:21 10:1 33:1,2 38:5,12 41:1 44:6,25 45:18,19

**duty** 27:2,10,15,17 31:5

## E

**e-mail** 54:10

**e-mailed** 12:16

**e-mails** 52:13

**earlier** 13:12 29:24 41:9 44:1

**early** 54:11

**earning** 37:16,18,20 38:2 40:14, 18,22 41:7,19

**editing** 52:25

**EEOC** 8:9,14,16,21 9:4 24:24 47:7, 8,10 48:2,9

**EEOC'S** 47:14

**effect** 10:5,9 42:11

**effective** 12:22

**employed** 8:13 11:19 17:10

**employee** 9:15,17,19,21 10:9 17:9 23:13,14,17,20 26:3 28:21 30:17 31:2,8,10,16 32:1,8 40:9 49:4

**employee's** 21:3

**employees** 17:20 18:2,3,8 19:3,23 20:4 21:21,23 22:3,18 23:5,8,11 25:19 31:22 32:5 35:14 43:23 54:18

**employees'** 18:21

**employer** 42:1 43:8

**employment** 14:1,2 26:22 51:2

**encountered** 15:18

**end** 15:21 52:8 53:22 54:4,8,15

**ensure** 11:3 13:12 15:11

**ensuring** 52:14

**entire** 20:10,12

**equal** 7:1,6,9 9:2,5 16:20 17:4 19:21 20:7,16,23 21:20 22:6 25:4 35:10 44:24 49:1 54:25

**evaluation** 18:3,5

**evaluations** 5:22 6:10 7:14 49:4

**eventually** 36:1

**EXAMINATION** 4:5 50:19

**examine** 5:19

**examples** 26:12

**exception** 13:6

**Executive** 4:15,16,17,24 17:6,7 30:1 33:15 35:1 36:1 37:7 50:21,24 52:20

**exhibit** 4:2 5:16 26:14,15 31:19 32:4 34:7,17,20 47:4,5 48:5,7 53:15,17 55:12

**expanded** 28:23,24

**expectations** 55:20

**experience** 12:1,3 44:25

**experienced** 11:5 48:22

**extended** 52:15

_____

**F**

**fact** 55:6

**facts** 6:22 10:12 18:13,25 22:3,4,5, 21 24:4,9 25:19 26:4 44:18 45:15, 21 49:21,22

**failed** 29:11

**failing** 31:10

**failure** 10:1,2 27:10,11,18,19,23 29:9 31:6,20

**fairness** 55:18

**fall** 16:8

**familiar** 42:6,10,24 44:10 45:1,2, 10,15,21,23 46:2,5 49:21

**feel** 39:11

**felt** 39:8

**female** 23:20 45:5 55:7,9

**females** 22:8 54:25 55:2

**FFATA** 27:12 31:20

**file** 21:3,7

**filed** 8:10,15,20 12:4 24:24 48:1,2, 9

**final** 19:8 47:10,13,15

**find** 11:20 47:11

**finish** 23:7 29:21

**finished** 50:17

**fiscal** 53:22

**flow** 54:14

**form** 23:9 27:12,20 31:21 54:5,6

**found** 8:16 12:2,7

**frame** 51:5

**fraud** 27:6 29:5,7,9,10,11 52:4,5,6

**FRIGERIO** 23:9 34:8,10 50:11,17, 20 53:16 55:23

**fulfill** 10:1

**full** 15:17

**funders** 52:23

**funding** 51:12 52:10 54:22

**funds** 19:12 53:22 54:1,2,4

_____

**G**

**Gamboa** 52:17

**gathered** 20:19

**gave** 8:17 12:19 26:7

**gender** 22:5 23:14,22 55:3

**genders** 33:12,19

**general** 16:12,17 17:19,21 19:1 21:15 22:20 23:12 35:6,7 42:16 45:8

**give** 12:18 17:21 19:10 27:7 28:14, 20 34:2

**good** 4:7 14:23

**Governments** 4:12

**grade** 33:2,9,11,14 34:25 44:25 45:9,19

**grades** 43:8,17

**gradually** 40:10

**grant** 27:24 51:9,24

**great** 10:3

**grounds** 9:7 47:11

**guideline** 30:8

**Guidelines** 9:16,17,20,22 10:9,16

_____

**H**

**handbook** 9:15,17,19,22 10:9,16 42:1 43:8,12

**handed** 5:16

**handing** 26:16

**happen** 14:11

**happened** 18:10,12

**harassment** 8:7,10 15:25 16:4,11 19:22

**head** 10:17 17:7 26:20

**hearing** 44:11

**Herr** 33:23 34:1,3,22 35:2,4,5,8,11, 12

**high** 55:17,19

**highly** 41:22

**hire** 33:13 45:1,11

**hired** 12:5 38:17 41:11 46:13

**hires** 42:15

**hiring** 38:9 42:1,22

**history** 44:12

**honest** 11:21

**HR** 11:3,7,9 15:19 16:7 17:7 28:10 30:2,3 33:10 42:23 43:9,14 46:22 48:13,15 53:5

**Huckabay** 11:8,13 12:13 13:24 14:17 15:7,14,23 30:5,6,9,11,13

**Human** 12:10

_____

**I**

**identity** 25:19

**illegal** 27:6 29:5

**immediately** 12:23,24 28:16 45:25

**impact** 54:17,18

**impacted** 54:14

**implement** 27:24

**implementation** 55:18

**implemented** 25:24

**important** 39:19,23 52:19 53:21

**Improvement** 10:22

**inaccurate** 51:15,16

**inappropriate** 51:17

**include** 20:10 28:24

**includes** 53:19,20

**including** 19:22 20:6 24:2 35:1 43:25 44:7 46:15 53:21

**incompetence** 27:1

**incomplete** 51:16

**increase** 17:19,23 18:8 36:25 38:4 41:22

**increases** 17:13,21,22 18:14,17 19:2,10 37:22,24 39:4,23 42:2,18

45:13

**increasing** 15:20

**indicating** 28:5

**individual** 23:13 29:12 45:6 50:13

**individuals** 45:5

**information** 7:1,10,13 9:2 20:14,
16 21:5,16 28:22 33:20,24 34:2
43:25 55:1

**informed** 15:19 26:6 50:8

**initial** 26:9 47:12

**initially** 26:5 49:15

**input** 14:12

**inquiries** 19:20 43:22 44:5

**inquiring** 54:10

**instances** 15:16 27:23 28:2,11
53:23

**insubordination** 10:2 27:2,25
44:13 51:21

**insurance** 8:14 44:11

**integrity** 53:2

**Interim** 39:2 40:24

**interview** 11:15

**interviewed** 11:17

**investigate** 12:6

**investigation** 5:20 7:5 8:6 9:1
20:3 29:10 31:13,21 32:10

**investigations** 6:1 20:6 25:3

**involve** 29:7

**involved** 6:16 9:5,7 19:23 20:5
24:22 33:11

**involves** 22:7

**involving** 19:23 20:4

**issue** 49:9,12,16 51:25 54:21

**issued** 10:18 48:4

**issues** 15:15,18 48:22 49:14 50:14
51:8,21 52:9 53:4

**item** 15:24 17:8 19:18 20:3 21:5,8
23:25 25:18 27:16,21,22,23 29:4
30:17 31:3,5,9,15,19,23 32:4,13
33:1,8,12 41:24 43:6,20 44:3,5,22
45:18 46:7,13

**items** 6:13 33:5

**J**

**January** 8:19,25 10:8 17:15 26:17
37:23 38:22 39:15,17,25 40:17
43:3,5 47:21 51:4 54:11

**job** 4:25 11:15 27:1 33:1,2 44:6,25
45:18,19

**Joe** 40:8,9

**Johnson** 46:23

**joining** 51:8

**July** 41:18 47:8 49:19 51:11

**June** 5:9 7:22 18:7,10,12,14,19,23
36:4,7,9 37:2,8,9 38:5 39:21 40:19
49:9,12

**justify** 15:11

**K**

**knew** 34:24

**knowledge** 6:14,23 7:3,5,9,13,16,
19,25 8:9,18 30:14 31:12,15 49:10

**L**

**Labor** 12:10

**laid** 25:22

**late** 52:18,24

**launch** 51:10

**launched** 51:11

**Law** 12:10

**lawsuit** 55:5

**lay** 32:15

**leadership** 55:16

**leading** 44:12,18

**learned** 52:23

**leave** 21:4 25:21

**led** 29:12

**level** 19:11 33:10

**lines** 32:5

**list** 5:18 27:3,9

**listing** 8:13

**litigation** 8:15

**Lodge** 29:18,22,23

**logical** 14:20

**longer** 11:10

**M**

**made** 5:2 7:6 8:24 9:8,11,12 11:2
14:4 15:5 21:24 22:1 24:2 25:2
36:20 39:20,22 42:14 45:11 46:8
52:3

**make** 12:22 53:9 54:24

**making** 13:15 14:8,12 36:24 37:24
40:16 41:13

**male** 22:18 23:5,8,11,17,20 44:24
45:5

**males** 22:8 23:1 54:24 55:2

**Management** 43:9,14 44:7,15
45:25

**manager** 40:10 42:22 46:5,22

**managers** 21:23 32:14 33:14
34:25

**mandatory** 9:25

**manner** 32:14

**March** 17:24 18:18,19,24 36:11
37:3 40:13,15,16 41:9,20

**March/april** 5:7

**mark** 26:13 34:6,17

**marked** 4:2 26:15 34:20 47:5 48:7
53:15,16

**marking** 47:3 48:5

**Martha** 5:23 6:9,10,21 7:6,10,14,
17,20 8:2,8,10 9:21 13:21 26:17
35:4,6,9,11,20,23 36:4,9,22 50:25
51:2,6

**matter** 19:24 20:5,9

**meeting** 13:23 14:3,5,14,23 49:15

**memo** 26:10,17,21 28:5,13 29:1

**men** 22:24 23:3 43:23

**mentioned** 48:13,16 50:12 51:25

53:19 55:13

**merit**  17:19,21,23 18:8,14,17,20
19:2,10 37:24 43:10

**met**  11:14,16 52:22

**Mexico**  14:4

**Michael**  35:25 36:10

**Mike**  35:22 36:8,21 37:11

**mind**  34:6

**mine**  11:5 36:10

**minute**  34:12

**Mobility**  44:7,15 45:24 46:5

**modifications**  51:18

**monitoring**  52:1,2

**Monreal**  29:12

**month**  11:6 48:22 51:7 54:8

**months**  41:23

**morning**  4:7

**Moseley**  37:13,15,22 38:8

**multiple**  39:13

---

**N**

**names**  33:12,19

**nature**  13:2

**needed**  52:25 55:16

**neglect**  27:1,9,15,17 31:5

**Nick**  29:12

**nods**  10:17 26:20

**non-profits**  54:16

**notice**  12:13,16,18,19,20,21,25
26:18 28:17,20

**notification**  52:16

**number**  4:2 5:17 9:15 15:15,21,24
17:8 18:23 19:18 20:3 21:8 23:25
25:18 26:14,15,25 27:5,16 28:2
29:4 31:16,20 32:4,13 33:20 34:20
43:6,20 47:4,5 48:6,7 53:15,17
55:12

**numerous**  48:19

---

**O**

**Object**  55:21

**Objection**  23:9

**obligation**  17:4

**obligations**  10:2

**occurred**  15:16

**October**  51:13

**offered**  12:13

**office**  12:16

**official**  4:20

**Ombudsman**  29:13 52:1

**one-month**  51:5

**operation**  51:21

**opinion**  11:24 13:14 37:5

**opposed**  10:22

**order**  11:4 13:13 14:21 18:25

**original**  33:13 41:1

**outstanding**  8:14

---

**P**

**p.m.**  56:1

**package**  15:17

**paid**  12:24 22:16,18,23,24 23:3,8,
12 46:9

**paperwork**  18:25 53:21

**part**  49:1

**participate**  11:1

**participated**  32:14,17

**particulars**  35:14

**party**  12:5,6,8

**pass**  50:10 55:23

**past**  46:22

**pay**  7:1,6,9 9:2,5 16:21 17:4,9
19:21 20:7,16,23 21:20 22:6,13
25:4 33:2,9,11 34:25 35:10 36:15,
17,18,21 37:10,21 38:7,13,14,23,
24 39:4,16 40:2,5 42:2,15,16,20
43:8,17,23 44:23,25 45:2,3,5,9,13,

---

19 46:15 48:25 49:1 54:2,15,18,25

**payment**  54:17

**peers**  44:24

**pending**  8:15,22 9:4,14

**people**  6:15 46:21

**perceived**  25:3

**performance**  10:1,21 17:24 18:2
27:1,10,19 31:6 45:7 49:9,12 51:22
55:3

**performing**  18:23

**period**  12:25 36:2 51:7

**person**  11:21 33:3

**personal**  12:1

**personally**  11:5

**personnel**  21:3,6,7 26:23,25 27:5
29:24 30:18 31:1

**persons**  32:13

**phrasing**  25:12

**place**  14:6 45:3 53:4

**Plaintiff**  5:23 8:8 24:4 25:25 32:16
43:25 45:20 46:8

**Plaintiff's**  16:2,11 20:6 33:3 43:21
44:5,23 46:9

**Plan**  10:22

**play**  55:10

**point**  35:24 48:4

**policies**  10:5 16:7,22 19:6 26:23
42:1,6,9,10,25 43:8,13 52:7 55:19

**policy**  16:1,11,12,17 17:1 19:4,5
25:23 26:25 27:5 29:24 30:19 31:1

**PONCIO**  4:6 23:16 26:16 34:9,11,
16,21 47:6 48:8 49:25 50:4,15,18
55:21,24

**portion**  46:21

**position**  4:14 5:2 22:8 23:22 33:3,
4,6 35:14,20,23 36:3,13 38:16,19
39:9,11 42:2,21 45:9,20,24 46:1,4,
15

**positions**  39:7 46:16

**possibility**  14:7

**posted**  5:8

Diane Doehne Rath

**posting** 5:2 46:15

**potential** 35:10

**practice** 14:23

**preceding** 6:23 28:17 45:25

**PRELIMINARY** 4:1

**prepare** 32:11

**prepared** 5:24,25 6:8,16,19 8:1 9:16 14:21 16:2,10 19:24 21:9,17, 19 23:16 24:4,8,11,17 25:14 26:1 30:13,23 31:2,8,25 32:7,23 33:4,7, 16 34:2 35:9 42:4 43:10 44:2,9,12, 14,19 45:8 46:10,16 49:22

**present** 14:17 19:24 20:5,9 24:2

**presenting** 15:19

**previously** 8:20 18:18 24:24

**prior** 5:22 6:2,10,16 7:10,13,14,17, 19,20 8:2,11 9:12 13:10,15,19 14:8 15:13 17:18 19:19 21:3,4 25:2 32:19,21,24 41:7 45:20 46:3 48:18, 23 49:3 50:24 51:8

**problems** 11:22

**procedure** 25:23 28:20

**procedures** 11:3 42:1 43:8,13

**PROCEEDINGS** 4:1

**process** 5:4

**produced** 20:21 50:7

**program** 29:13 33:7,14 34:25 36:7 40:12 42:22 43:24 44:8,15,19 46:1, 13 51:10,22 52:1

**programs** 19:12 53:2

**progression** 14:21 15:15,20

**Project** 43:9,14

**promoted** 39:1 40:11 41:21

**promotion** 39:25 41:8,13

**promotions** 39:24 42:2

**provided** 6:5 17:19 18:6 20:15 28:18 43:25 47:7 48:24 53:7

**provisions** 19:4

**Public** 38:17

**pull** 55:17

**pulled** 51:24

**purports** 37:8

———————————

**Q**

———————————

**Quarter** 27:11 31:7

**Quarterly** 27:10,19 31:6

**question** 6:18 10:6 22:6 25:7,12 32:11 35:3

**questions** 43:22 44:6,17 55:24

**Quinn** 35:22,25 36:8,10,21 37:2,11

**Quinn's** 36:15

———————————

**R**

———————————

**raised** 49:12,16

**raises** 42:2

**Ramos** 40:8,9 41:4

**range** 35:7 37:6 42:20

**ranges** 43:17 45:3

**rate** 42:15

**rates** 48:25

**Rath** 4:3,9,10 50:7,21

**read** 7:22,25 47:10,12,14,23 49:10

**ready** 6:3

**realized** 5:1

**reason** 26:11 27:2,6,9,13,22 29:8 38:23 39:16 44:22 51:6

**reasons** 22:13 24:3 26:7,8,10,11 27:21 28:6,25 29:2 35:17 36:21 37:1,10 38:7 40:4 44:18 49:18 53:18 55:11

**rebuild** 52:21 55:14

**recall** 14:3,5,8,11,14,22,25 15:4,7 26:7 48:14,17

**receive** 28:23 48:10

**received** 8:13 17:9,10 18:1 23:15, 18,21 41:10,13,22 48:19 49:4 51:13,14 52:11,16 54:11

**receiving** 22:4 41:2 48:14

**recent** 46:22

**recess** 34:14 50:2 53:13

**recognize** 6:25 12:11

**recollection** 48:4

**recommendation** 15:1,2,5,8,10 19:11 42:21

**recommended** 14:9 19:15

**record** 4:8 47:6 50:4,11

**refer** 33:24 35:3

**referenced** 29:24

**referring** 34:4,18

**reflecting** 39:4

**regard** 9:19 13:1,9 15:24 16:14 25:25 30:16 31:1,5,16 32:18 35:8 42:24 50:6

**regulation** 25:24 30:7

**related** 5:21 6:20 7:20 8:6 16:1,11 24:4 36:3

**Relations** 38:17

**release** 54:4

**remained** 17:10

**remaining** 21:17

**remember** 12:10,12 47:16

**reminder** 52:11

**removal** 44:18

**removed** 44:7,8,15

**removing** 46:5

**repaired** 17:11

**repeat** 23:21

**report** 17:4 27:11,19 29:9,11,25 31:6 33:16,17,18 34:4,17 35:2,12 51:13,14 52:1,2,10,24 53:4,24

**reported** 14:19 29:14,22 30:6,9, 11,14 52:4

**reporting** 27:5 29:5,17 53:3

**reports** 10:3 11:18 19:20 27:14 43:23 44:6 52:17,25

**Representative** 4:11 5:11,12,19 6:7,20 19:19 24:1 41:25 43:7,21 50:5,9

**reprimand** 10:19

**reprimanded** 25:21

Diane Doehne Rath

**reputation** 11:13 52:21,24 53:2 55:15

**request** 20:16 28:22

**requested** 7:10 28:19 31:3 50:5

**requests** 7:6,9 20:7 21:4,6

**required** 54:5

**requirements** 33:2 45:19

**resignation** 12:14,17,22,24

**resigned** 40:19,20

**resources** 12:10 54:14,19

**respect** 13:6

**respond** 33:19 34:2

**responding** 52:2

**response** 22:2 51:15 54:11 55:8

**responsibilities** 33:3 35:13 38:11 45:7,20 55:4

**responsibility** 39:4

**responsiveness** 55:21

**restore** 53:1,2

**results** 24:20

**resumed** 41:1

**retaliation** 8:8,11 16:1,5,15,18,21, 25 20:8 24:8,18,20,21 25:9,15

**returned** 13:18 14:4

**review** 22:21 29:10 42:17 48:18

**reviewed** 21:6 22:21 48:23 49:3 55:1

**reviewing** 45:2

**rights** 27:24 51:10,22

**risk** 51:23

**Robert** 52:17

**rule** 25:23

---

## S

**salaries** 21:21,23 22:1,3,4,16,22 23:21 37:2

**salary** 17:12 21:15,22 22:17 23:15, 18,20 33:14 34:25 35:12,13,15 36:3 39:22 41:11 42:17 43:17

**scenario** 54:25

**score** 18:5

**scored** 18:3

**seek** 13:14

**Senior** 11:8,17 28:10 30:1,3 33:15 35:1 39:1,6,9,12,14,15 40:1,23 41:3,4,6,8,13,15

**seniority** 43:9,13 44:24

**sentence** 29:21

**separately** 50:16

**served** 40:24

**service** 53:3

**services** 55:19

**set** 26:3 28:25

**setting** 53:1

**sex** 9:8 16:24 17:4 19:21 20:8 22:7 25:4

**Sherrie** 11:8,13,14 13:24

**short** 51:5 53:9

**show** 26:13 47:3 48:5

**significant** 54:17

**significantly** 54:19

**similar** 22:8 35:19,22 36:13 38:15, 19 40:25

**single** 52:24

**sir** 4:13,22 5:6,15 7:4,8 9:10,18 10:11,15,23,25 11:2,11,22 13:17, 22 16:5,16,23 17:2,17 18:9,15 19:17 23:19 25:10 27:4,17 31:14 32:12 33:22 34:19 35:16,21 36:6, 14 37:12 38:6,21 40:3 41:20 42:5,7 43:5 44:21 45:14 46:11,18 47:20, 22,25 48:11,21 49:2,6,20,23 53:6, 19 55:1,13,22

**size** 55:4

**skill** 44:25

**skipped** 44:22

**small** 19:7 54:16

**sole** 11:2 55:11

**solely** 11:4

**speak** 6:2,13,22 36:25 38:5 42:11,

13 43:1

**specific** 6:18 10:6 15:6 28:11 31:23 36:2 38:11 47:17

**specifically** 14:22 23:1,2 35:5 48:14,17

**specificity** 42:11 43:1

**specifics** 16:8,13 23:19 30:22 43:15 49:11,15,17

**specter** 20:2

**Spinks** 5:23 6:9,10,21 7:6,10,14, 17,20 8:2,8,10,19,25 9:21,24 10:7 13:11,21,25 14:10,18 15:3 16:9 19:16 20:1,10,12,15 22:9,19,24,25 23:8 26:6,17 28:8,14,19 30:25 31:3,9 32:2,8,18 35:4,6,9,11,20,23 36:4,13,17,22,23 37:11,18 38:8,10, 16,20,25 39:9,17,21 40:5 41:10,11 43:3 45:22 47:23 48:8,19,24 49:4, 19 50:25 51:6,15 52:3,13 54:6 55:6,12

**Spinks'** 16:13 29:9 51:2

**Spring** 4:25 5:5

**standards** 55:17

**standstill** 54:20

**start** 37:13

**started** 4:17,19 6:12 11:17,18 36:4,9,11,12,19 37:3,15 39:20,21 40:9 45:16,25

**starting** 13:19 32:21

**state** 4:7

**stated** 22:15

**statement** 22:20 47:7

**states** 29:24

**statewide** 55:16

**status** 52:14

**steps** 14:20,24

**subject** 26:18

**subjected** 25:9 30:18

**submit** 10:3 27:10,11,18,19 31:6, 11,20 54:9

**submitted** 7:24 21:16 49:1 51:20 52:12,15,18 54:5,9

Diane Doehne Rath

**submitting** 53:21

**subsequent** 37:21 45:13

**substantiate** 47:11

**substantiation** 12:7

**sue** 8:17

**suffered** 16:21,25

**sufficient** 54:14

**suggestions** 51:17

**suit** 24:2

**superior** 17:7

**supervisor** 18:6,22 19:11 29:25 46:12 49:23

**supervisors** 19:23 20:5 21:24 32:14

**supposed** 51:11

**Survey** 43:9,14

**surveys** 21:22

**suspected** 29:9,11,12

**suspended** 10:13,15 25:20,21

**suspicion** 52:6

**sworn** 4:4

### T

**talk** 50:13

**talking** 34:21

**team** 55:16,20

**ten** 25:23

**term** 13:7

**terminate** 8:25 9:11,20,23 10:7, 11,24 14:9 19:15 24:22,23 32:15 51:2

**terminated** 8:19 17:15 25:22 28:21 32:6 43:3 44:13 47:23 48:8 55:6,11

**terminating** 10:22 13:10 26:6,22

**termination** 5:21 6:1,3,17 7:23 8:7 12:22 13:9,14,15,20 14:18 15:12, 13 17:13 19:22 20:1,11,13 21:11, 14,15 24:3,6,10,15,19,21 25:8,16 26:2,19 28:6,9,16,17,21 30:13 32:17,19 38:9 48:10,18,23 49:3

51:6

**testified** 4:4 32:16 41:16 44:2

**testify** 5:13,24,25 6:7,8,19 8:1 9:16 15:25 16:2,10 17:11 19:19,24 20:23 21:9,19 23:17 24:1,5,8,12,17 25:14 26:1,2 30:23 31:2,8,25 32:7, 23 33:4 35:3,9 40:4 41:25 42:4 43:7,10,21 44:2,9,19 46:10,16,25 47:1 49:22 50:6,9

**testimony** 6:15 19:14

**Texas** 51:9,24

**thing** 16:14

**Tim** 13:16,20,24 19:14 38:15,24

**time** 5:3 10:4,10 11:9,14,15,17,23, 24 12:11 17:12,13 18:20 19:5 21:22 22:16,22 28:9 30:4 36:2,15, 17,18 37:19,20,23 38:9 40:2,22 46:23 47:18 48:13 51:5,20 52:22 55:25

**timely** 10:2

**title** 33:13 34:24

**titles** 33:12,19

**today** 5:10 6:19 9:17 19:14 23:17 24:12,17 32:1,11,16,24 33:4 35:10 50:6,7

**told** 15:10 54:3

**top** 18:22

**total** 28:4

**totally** 21:13

**training** 44:25

**treat** 13:6

**treated** 54:25

**Trevino** 13:16,20,24 14:3,9,15,17, 19 15:1 19:15 30:1 38:15,24 39:17, 20,23 40:5 41:1 44:21 46:11 49:24 52:13

**troubled** 52:22

**troubling** 51:23

**truthful** 11:20 12:2

**truthfulness** 11:25

### U

**Uh-huh** 10:17 26:20

**understand** 4:10 5:10,13 14:15 25:6,9,12,13 26:10

**understanding** 6:14 7:2 10:7 28:18

**unemployment** 8:14 44:11

**unequal** 43:23

**unreported** 52:6

**Unsatisfactory** 27:1

**unusual** 41:22

**upcoming** 14:18

**upgrades** 42:3

**utilized** 25:24

### V

**vacated** 12:16

**vendors** 54:2,15,16

**Veterans** 51:10,24

**Vets** 27:25 51:11,22

**violated** 31:9,22

**violation** 16:21,22,23,25 22:7 30:18 31:17

**violations** 17:5 19:20 20:24 25:4 26:23 32:7

### W

**wages** 33:1 45:18

**Wait** 23:7

**waiting** 19:8

**wanted** 15:10

**week** 6:6

**weeks'** 12:18,19,20,21

**women** 22:23 23:3 43:23

**words** 10:13

**working** 48:20

**written** 10:18

Diane Doehne Rath

**wrongful** 19:21

---

### Y

**year** 13:18 41:12 53:23 54:5,15

**year-and-a-half** 41:12

**years** 25:23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MARTHA SPINKS** | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:15-CV-00749-RP** |
| | § | |
| | § | |
| **ALAMO AREA COUNCIL OF** | § | |
| **GOVERNMENTS** | § | |

**ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND/OR TO**
**STRIKE, RESTRICT, EXCLUDE OR DISALLOW EVIDENCE ADDRESSED BY THE**
**30(b)(6) DEPOSITION TESTIMONY**

Before the Court was Plaintiff's Motion for Summary Judgment and/or to Strike, Restrict,

Exclude or Disallow Evidence Addressed by the 30(b)(6) Deposition Testimony.  After due

consideration, the Court orders that Plaintiff's Motion is hereby GRANTED and Summary Judgment

is GRANTED as to liability for the claims of discrimination, retaliation and violations of the equal

pay act.

It is therefore ORDERED that Plaintiff's Motion is GRANTED.

Signed on _____ 2016

_____
HONORABLE JUDGE